**Kevin Lee HOUGH, Appellant,**

v.

**STATE of Indiana, Appellee.**

No. 02S00–8712–CR–1179.

Supreme Court of Indiana.

Oct. 4, 1990.

Opinion on Rehearing Dec. 13, 1990.

Bruce R. Snyder and Bruce S. Cowan, Fort Wayne, for appellant.

Linley E. Pearson, Atty. Gen. and Arthur Thaddeus Perry, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant–Appellant Kevin Lee Hough was charged in the Allen Superior Court, Criminal Division, with the knowing or intentional murder of Martin Eugene Rubrake and Theodore G. Bosler. The State also filed an Application for Death Sentence. The jury found Hough guilty of both counts of murder and further recommended the death penalty be imposed. The trial court found Hough guilty of the two murders, found sufficient aggravating factors peculiar to Hough and the crimes which outweighed mitigating circumstances that existed, and imposed the death penalty.

Six issues are presented for our review in this direct appeal:

1. violation of Hough's constitutional rights when members of the victims' families stood up to be introduced during the sentencing hearing, and inclusion in the presentence report of letters and opinions of the victims' family members;

2. refusal of the court to appoint experts to assist Hough in the preparation of his case;

3. alleged improper foundation and chain of custody of items of evidence;

4. permitting the application for death penalty to contain an allegation of robbery;

5. error in using statutory aggravating circumstances against him during sentencing; and

6. erroneous jury instructions used during sentencing.

The facts show that victims Ted Bosler and Gene Rubrake lived together at 1127 West Wayne Street in Fort Wayne, Indiana. On November 6, 1985, Kevin Hough and his brother, Duane Lapp, went to the home of Bosler and Rubrake and killed both of them by shooting them with a .45 caliber automatic pistol. Witness Don Maley testified he had known Hough for about three months and on that date saw him at about 5:00 p.m. The two of them went to the vicinity of the victims' house and walked around the area. Hough then took Maley home and when they got back to Maley's house, Maley asked Hough what the trip was all about. Hough told Maley his cousin was renting from "two guys" and when his cousin couldn't pay the rent the two guys had taken his "stuff" and he,

Hough, was going to get it back for him. Maley asked Hough why he hadn't done it when they were in the neighborhood and Hough said there were some people there and he would have to go back later. Later that evening Maley again saw Hough, who told him, "I went back to that house tonight and pulled a gun on those guys and one of those guys lunged at me and I shot him. I told the other guy to get on the ground and I shot him through the back." *Record* at 895. Hough also told Maley he had taken some rings from the two men. Bosler and Rubrake were known to wear jewelry frequently but their rings were not found after their deaths.

Duane Lapp testified he and Hough went to the victims' residence at about 7:50 p.m. By a circuitous route they walked to the corner of Wayne and College where Rubrake was taking groceries out of a car. Hough talked to him and offered to help carry the groceries into the house and they did so. Bosler joined them inside. They all went downstairs into the basement where Hough pulled a .45 caliber automatic pistol from his shoulder holster, pointed it at the two men and told them to hit the floor. Lapp testified the older of the two men swung at Hough with a television remote control and Hough shot him in the chest. The younger man dropped to the floor and Hough shot him in the back. Hough also shot the older man in the face. Lapp and Hough started up the stairs and Hough walked back down to retrieve a container of beer and the remote control unit, both of which had his fingerprints on them. On his way up the stairs, Hough stepped on the older man's face. Lapp and Hough walked back to the car, went to Maley's house, then back to Hough's residence, arriving there about 8:47 p.m.

Hough told his sister, Joyce Hough, between 9:00 and 9:30 p.m. on November 6 that he had "walked into a set-up" and had killed two people.

## I

At the formal sentencing hearing before the court, the prosecutor had the families of the two victims in the instant cause and the family of a victim of a prior murder for which Hough had been convicted stand, and he introduced them to the court as the families of the victims. He then stated:

> I believe this Honorable court has had an opportunity to read the letters that were submitted to the court as part of the presentence investigation. Those letters are unanimous. They all ask that the death penalty be imposed upon Mr. Hough for the cold, calculated way he murdered those three families, those three loved ones.

*Record* at 552–53. The prosecutor made no further reference to the families or their letters in his argument. Hough made no objection to the introduction of the family members nor to the inclusion of the letters in the presentence report or the prosecutor's reference to the letters. Accordingly, the issue is waived unless error was so fundamental it violated Hough's constitutional rights to the extent waiver is not dispositive. *Johnson v. State* (1985), Ind., 472 N.E.2d 892, 910.

Hough relies on *Booth v. Maryland* (1987), 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440. Booth was convicted of the robbery-murder of Irvin Bronstein, age 78, and his wife, Rose, age 75, in their home in West Baltimore. The evidence showed the victims were bound and gagged and then stabbed repeatedly in the chest with a kitchen knife. The bodies were discovered two days later by the Bronsteins' son. In Maryland, the legislature required the filing of a victim impact statement (VIS) in all felony cases, describing the effect of the crime on the victim and his family. Pursuant to this statute, the State Division of Parole and Probation filed, as a part of the presentence investigation report, statements from the victim's son, daughter, and grandchildren. The statements described in detail the tremendous impact on these family members of the loss of their parents and grandparents and the violent way in which the Bronsteins met their death. The statements described the emotional and personal problems of the families because of fear, lack of sleep, depression, being withdrawn and distrustful, inability to

watch violence in movies or even in news broadcasts, and, even after a lapse of several months, an inability to put the matter out of their minds. The victims' daughter attempted to counsel with a psychologist and gave it up after several months, stating no one could help her. She doubted she would ever recover from the trauma she received from this incident. One of the granddaughters was to be married two days after the bodies were discovered. All agreed the ceremony and reception were sad affairs and instead of leaving on her honeymoon she attended her grandparents' funerals. The Division of Parole and Probation indicated in their report that it was apparent the murder of the Bronsteins was such a shocking, painful, and devastating memory to the family that it permeated every aspect of their daily lives and it was doubtful they would ever fully recover from the tragedy.

The court found the use of the VIS in the sentencing phase of a capital case violated the Eighth Amendment to the United States Constitution. It found that a jury's discretion to impose the death sentence must be "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action [and in doing so] must make an 'individualized determination' of whether the defendant in question should be executed, based on 'the character of the individual and the circumstances of the crime.'" 482 U.S. at 502, 107 S.Ct. at 2532, 96 L.Ed.2d at 448. (citations omitted). The Court found that in assessing personal responsibility and moral guilt of the defendant, factors that do not focus on his character and blameworthiness are irrelevant. The VIS in *Booth* provided the jury with personal characteristics of the victims and the emotional impact of the crimes on the family and set forth family members' opinions and characterizations of the crime and the defendant. The court found these statements to be irrelevant to a capital sentencing decision and created a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner. *Id.* at 502–03, 107 S.Ct. at 2533, 96 L.Ed.2d at 448.

We do not find an Eighth Amendment violation here as described in *Booth*. No reference was made in court to the character of the victims or the physical or mental impact of the loss of the victims on their families. After the jury made its recommendation to impose the death penalty, the families were introduced as a group to the judge as a courtesy gesture. The letters of the family members included in the presentence investigation report asked that the death penalty be imposed upon Hough for the cold, calculated way he murdered the victims. The letters did not not describe the impact of the crime in such detail as to fall under the rule in *Booth*. We find the present case to be more like that in *State v. Post* (1987), 32 Ohio St.3d 380, 513 N.E.2d 754, *cert. denied* (1988) 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023, a capital case in which victim impact evidence was presented to the three-judge sentencing panel. The Supreme Court of Ohio held the defendant showed no prejudice to him because the evidence was not presented to a jury and there was no indication the panel considered the victim impact evidence. *Id.* 32 Ohio St.3d at 384, 513 N.E.2d at 759. Similarly, in the present case, there is no indication in the record that the court even considered the families or their letters. The court's finding of aggravating circumstances was based on the evidence and on proper grounds that we will discuss later in this opinion. No error is presented on this issue.

## II

Hough requested the court appoint a psychologist or psychiatrist and a ballistics expert to assist in the preparation of his defense.

More specifically, Hough filed a motion for appointment of a social psychologist to assist in selecting the jury and a psychologist for developing a complete psychological profile of Hough to assist counsel in developing and presenting a defense at both the evidentiary and penal phase of the proceedings. This motion was denied by the trial court.

Hough relies on *Ake v. Oklahoma* (1985), 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53, to support his position. Ake, an indigent, was charged with murdering a couple and wounding their children. The record shows that at his arraignment the defendant's behavior was so bizarre the trial court *sua sponte* ordered that he be examined by a psychiatrist. The examining psychiatrist found petitioner to be incompetent to stand trial and suggested he be committed. Six weeks after having been committed, petitioner was found to be competent on the condition that he continue to be sedated with an anti-psychotic drug. Subsequent to this finding, at a pretrial conference the defense informed the trial court the defendant would raise an insanity defense. Defense counsel asked the court to arrange to have a psychiatrist perform an examination or provide funds to allow the defense to arrange one because no inquiry had been made into the defendant's sanity at the time of the offense. The trial court denied the motion. At the guilt phase of trial, the sole defense was insanity. The examining psychiatrist testified petitioner was dangerous to society but there was no expert testimony for either side on the issue of the defendant's sanity at the time of the offense. In Oklahoma, one of the aggravating circumstances justifying the imposition of the death penalty is the likelihood of petitioner's future dangerous behavior. The state was able to rely on the examining psychiatrist's testimony to establish that the likelihood of petitioner's future dangerous behavior was apparent. The Supreme Court· found that when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a state provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one. *Id.* at 74, 105 S.Ct. at 1091–92, 84 L.Ed.2d at 60.

> [W]ithout a psychiatrist's assistance to conduct a professional examination on issues relevant to the insanity defense, to help determine whether the insanity defense is viable, to present testimony, and to assist in preparing the cross-examina-

tion of a State's psychiatric witnesses, the risk of an inaccurate resolution of sanity issues is extremely high. [This is so particularly] when the defendant is able to make an *ex parte* threshold showing that his sanity is likely to be a significant factor in his defense....

*Id.* at 82–83, 105 S.Ct. at 1096, 84 L.Ed.2d at 65–66. The court found the same significance to attach to the State's showing of an aggravating factor in regard to the defendant's future dangerousness.

Hough did not claim at trial nor does he now claim that he was insane at the time this crime was committed or that he was incompetent to assist in his defense at trial, and neither of these circumstances is apparent in the record. His request was for the appointment of a social psychologist to help select the jury, and a psychologist to present a profile of his defense at both the fact-finding and sentencing phases. *Ake, supra,* cannot be read to refer to the issue raised by Hough in the instant case.

██ Appointment of an expert witness for an indigent is left to the sound discretion of the trial court. *Schultz v. State* (1986), Ind., 497 N.E.2d 531, 533; *Lowery v. State* (1985), Ind., 478 N.E.2d 1214, 1220, *cert. denied* (1986), 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 900. In *Himes v. State* (1980), 273 Ind. 416, 418, 403 N.E.2d 1377, 1388, this Court stated:

> The determination must be made in the context of the case, and we are of the opinion that only a clear abuse of that discretion will loom as denial of due process.

Furnishing of an expert is not required when the purpose of the examination appears to be exploratory only. *United States ex rel. Smith v. Baldi* (1953), 344 U.S. 561, 568, 73 S.Ct. 391, 395, 97 L.Ed. 549, 556; *Schultz, supra; Himes,* 273 Ind. at 419, 403 N.E.2d at 1379. In the instant case, Hough has given no indication of what he expected to establish by use of a psychologist or a psychiatrist. · The purpose of the request for an expert here appears to have been exploratory only and the court did not abuse its discretion in rejecting it.

■ The same can be said of Hough's request for an independent ballistics expert to aid in preparing the cross-examination of Trooper Fazio, the State Police ballistics expert who matched shell casings found at the crime scene with those retrieved from Hough's fiance's apartment. This issue also is governed by *Schultz, supra.*

In *Schultz,* the defendant sought experts to examine a pair of work boots, tennis shoes, and a towel, all taken from the defendant's residence. This Court noted that the testimony of the State's experts involved "precise physical measurements and chemical testing, and there is no showing that these experts were less than precise or able in their testing and observations, that the truth or accuracy of their testimony is questionable by some new evidence, or that there is evidence available or likely from other experts which would indicate they were wrong." 497 N.E.2d at 534.

In the instant case, Hough has offered no grounds from which to reason or suppose that any other expert would find cause to question the State's witnesses, observations, or conclusions. He seeks exploratory investigation with no showing of its probable results. The trial court did not abuse its discretion in denying this request.

### III

■ Hough claims State's Exhibits 4, 5, 6, 7, and 8 were improperly admitted owing to an allegedly inadequate chain of custody. Exhibits 4, 5, and 6 are spent shell casings retrieved from the crime scene, and 7 and 8 are spent shell casings retrieved from Hough's fiance's apartment. State's Exhibits 4A, 5A and 6A are photographs of the spent shell casings found at the crime scene. The exhibits all consist of spent brass shell casings, physical evidence which is not easily tampered with. The chain of custody rules for such items are less rigorous than for fungible items such as narcotics and currency. *Dier v. State* (1982), Ind., 442 N.E.2d 1043, 1046. In *Dier,* this Court articulated the rule:

> The mere possibility of tampering will not render evidence inadmissible. *Starkey v. State* (1977) 266 Ind. 184, 361

N.E.2d 902. In the case of non-fungible goods, it is sufficient if the chain of custody strongly suggests the whereabouts of the exhibits at all times. *Gurley v. State,* (1976) 264 Ind. 552, 348 N.E.2d 16. All evidence is not subject to the chain of custody rule. *Woodard v. State,* (1977) 267 Ind. 19, 24, 366 N.E.2d 1160, 1164. "If the offered item possesses characteristics which are fairly unique and readily identifiable, and if the substance of which the item is composed is relatively impervious to change, the trial court is viewed as having broad discretion to admit it merely upon the basis of testimony that the item is the one in question and is in a substantially unchanged condition." *McCormick on Evidence,* 2d Ed.Sec. 212, p. 527. *In accord Duncan v. State,* (1980), Ind., 409 N.E.2d 597, 601.

*Id.*

■ Officer Fazio was able to identify the exhibits by pointing out his initials on them. The movement of the exhibits was established by Detective Alfeld, who testified from the continuity records kept by the Fort Wayne Police Department that Exhibits 4, 5, and 6 were taken into custody on November 7, 1985, by Technician Hill, who gave them to Sergeant Pettet the same day. On February 7, 1986, they were given to Technician Letwinko and on the same day to Sergeant Butts, who transferred them to the Indiana State Police Laboratory on February 10, 1986. They were returned to Letwinko on March 13, 1986, resubmitted to the Indiana State Police Laboratory on May 14, 1986, and returned again to Letwinko on June 26, 1986. They were transferred to the Deputy Prosecutor on March 6, 1987, and on May 13, 1987, to Detective Alfeld. Again testifying from the continuity records, Alfeld testified Exhibits 7 and 8 came to him from Mr. James Akers, apparently a relative of Hough's fiance, and on the same day he gave them to Technician Letwinko, who on the same day transferred them to the Indiana State Police Laboratory. They were returned to Letwinko on June 26, 1986, transferred to the Deputy Prosecutor on March 6, 1987,

and transferred to Detective Alfeld the morning of his testimony. The movements of Exhibits 4, 5, 6, 7, and 8 within the Indiana State Police Laboratory were testified to by Mr. Zauner. Hough claims the witnesses did not testify that the exhibits were substantially unchanged during the time they were in State Police custody. As stated in *Dier, supra,* it is sufficient to show in the case of non-fungible evidence that a chain of custody is established which strongly suggests the whereabouts of the exhibit at all times. *Dier* further provides that the establishing of chain of custody is not necessary if the witnesses can identify the item by looking at it and testifying it is substantially unchanged from the time it was taken into custody. There is no showing or suggestion that the items were materially changed while in police custody. On the other hand, the evidence strongly suggests a continuity in chain of custody that indicates the whereabouts of the exhibits at all times and sufficiently shows they are the same items originally gathered from the scene and from the apartment of Hough's fiance. We find no error on this issue.

### IV

Paragraph (2) of the Amended Application for Death Sentence stated that Hough, on November 6, 1985, while committing or attempting to commit robbery, did knowingly or intentionally shoot at and against the bodies of Martin Eugene Rubrake and Theodore G. Bosler with a deadly weapon thereby inflicting a mortal wound or wounds in and upon the bodies of the individuals causing them to die. One of the aggravating circumstances provided for in Ind.Code § 35–50–2–9(b), quoted in relevant part by the trial court, is the commission of murder by intentionally killing the victim while committing or attempting to commit enumerated felonies, one of those felonies being robbery. Hough claims it was error to allow the application of the death penalty to contain an allegation of robbery when no evidence was presented that robbery was involved. Ind.Code § 35–42–5–1 defines robbery as follows: "A person who knowingly or intentionally takes property from another person or from the presence of another person: (1) by using or threatening the use of force on any person; or (2) by putting any person in fear; commits robbery."

Donald Maley testified Hough told him before this incident that one of Hough's cousins was renting from the victims and had fallen behind on his rent whereupon the victims kept his "stuff" and Hough was going to get it back. He had also made a statement to Maley he was going to collect some money from "those guys." He later told Maley he shot the victims and took some rings. Considering all of Hough's actions here, including the manner in which he went into the residence and killed the two victims, there were sufficient facts from which the jury could reasonably have inferred that Hough's intent in going to the victims' residence was to obtain money and/or property and he shot and killed the victims in order to do so. Hough's citation to *State v. McCormick* (1979), 272 Ind. 272, 397 N.E.2d 276, is inapposite. That case dealt with the constitutionality of charging the death penalty under IC 35–50–2–9(b)(8). This Court held that charging as an aggravating circumstance a separate and·unrelated murder where a defendant had not been convicted of that murder violated due process. *Id.* at 278, 397 N.E.2d at 280. The death penalty in this case was charged under sub-section (b)(1) and concerned an act relating directly to the crime constituting the principal charge. There was sufficient evidence from which the jury could find or infer that the murders took place in the course of commission of a robbery. Thus, there was no error in permitting the application for death penalty to allege a robbery.

Following verdicts of guilty and recommendation of the death penalty by the jury, the trial court held a sentencing hearing and filed in writing his judgment finding Hough guilty of each of the two murders and imposing the death penalty. His reasons for the imposition of the sentence were that the aggravating circumstances peculiar to Hough and the crimes were that Hough committed the murder of Martin Eugene Rubrake by intentionally killing

the victim while committing or attempting to commit robbery; that Hough had heretofore been convicted of the murder of Antony Bartkowiak; that the same reasons apply for the imposition of the death sentence as to the murder of Theodore G. Bosler; and in addition, at the time of the murder of Theodore G. Bosler, Hough had committed the murder of Martin Eugene Rubrake. The court found that the aggravating circumstances outweighed any mitigating circumstances that existed and warranted the death penalty and that the sentence permitted by statute is appropriate. The evidence supports the trial court's findings of aggravating circumstances and we find the sentence to be appropriate.

## V AND VI

Hough's last two contentions were raised for the first time in this Court in an amendment to his appellate brief. Therefore, because they were not properly raised at trial, they should be deemed waived. *Daniel v. State* (1988), Ind., 526 N.E.2d 1157, 1162; *Lowery v. State* (1985), Ind., 478 N.E.2d 1214, 1223–24, *cert. denied* (1986), 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 900. However, assuming the defense did not waive these issues, their arguments must fail on their merits.

 Hough first contends, citing *Thompson v. State* (1986), Ind., 492 N.E.2d 264, that the statutory aggravating circumstances in IC 35–50–2–9(b) were invalidly used against him. The specific aggravators involved are IC 35–50–2–9(b)(7) which states "The defendant has been convicted of another murder" and IC 35–50–2–9(b)(8) which states "The defendant has committed another murder, at any time, regardless of whether the defendant has been convicted of that other murder." The aggravator in subpart (b)(7) contemplates the situation in which the defendant has committed a murder unrelated to the principal murder charged, for which he has already been tried and convicted in a separate proceeding. *State v. McCormick* (1979), 272 Ind. 272, 279, 397 N.E.2d 276, 281. Subpart (b)(8) is considered in cases involving double or multiple murders for which the defendant is being tried in one proceeding.

*Davis v. State* (1985), Ind., 477 N.E.2d 889, 893, *cert. denied* (1985), 474 U.S. 1014, 106 S.Ct. 546, 88 L.Ed.2d 475; *Judy v. State* (1981), 275 Ind. 145, 170–71, 416 N.E.2d 95, 109.

In *Thompson*, a capital case involving a double murder, this Court vacated Thompson's death sentence because the jury was instructed on the aggravator in subpart (b)(7) when it should have been instructed on subpart (b)(8) and not on (b)(7). The jury returned a guilty verdict on both counts of murder, but this Court found the term "conviction" means the entry by the trial court of a judgment of conviction. *Thompson*, 492 N.E.2d at 270. Therefore, the trial court could not rely on the guilty verdict for one count of murder to fulfill the subpart (b)(7) requirement of "conviction" to impose the death penalty for the other count of murder.

Hough uses this holding in *Thompson* to require that he be convicted of one murder at the time he committed the other for the prior murder to be used as an aggravator in sentencing. *Thompson* does not stand for such a proposition. In the present case, Hough was convicted of a double murder, having killed both Ted Bosler and Gene Rubrake, and was previously convicted in a separate proceeding of murdering Antony Bartkowiak. Therefore, the aggravators in both subpart (b)(7) and subpart (b)(8) were properly considered by the trial court. Additionally, the trial court correctly considered the aggravator in subpart (b)(1), intentional murder in the commission of robbery. The jury, properly instructed on all three aggravators, *record* at 1341–42, returned a recommendation of the death sentence. Later, the trial judge listed all three aggravators when it sentenced Hough to death. *Record* at 412. Because the statutory aggravating circumstances were validly used in Hough's sentencing, he presents no cause for reversal here.

The other issue raised in the amendment to Hough's appellate brief concerns the jury instructions used in sentencing. Hough argues that his sentence of death can not be upheld because the State's amended application for death sentence and

the trial court's instructions misstated the level of culpability required for the jury to recommend the death penalty.

Indiana Code § 35–50–2–9(b)(1) lists as an aggravating circumstance that the "defendant committed the murder by intentionally killing the victim while committing or attempting to commit ... Robbery." The aggravating circumstances in IC 35–50–2–9(b)(7) and (8), also indicated by the prosecution in Hough's case, do not specify the level of intent required to recommend the death penalty.

Paragraph (2) of the State's amended application for death sentence recited the aggravating circumstance as follows:

(2) that on or about the 6th day of November, 1985, in the County of Allen, State of Indiana, said defendant, Kevin Lee Hough, while committing or attempting to commit robbery, did knowingly or intentionally shoot at and against the bodies of Martin Eugene Rubrake and Theodore G. Bosler....

*Record* at 1195, 1343. The trial court read the entire application for death sentence, including the above portion, at the beginning and at the end of the sentencing hearing. At the same times, the court also quoted the relevant statutory aggravators, specifically stating, pursuant to IC 35–50–2–9(b)(1), that the State must prove beyond a reasonable doubt "that the defendant committed a murder by intentionally killing the victim while committing or attempting to commit robbery...." *Record* at 1197–98, 1341.

■ Although a conviction will not be upheld if a jury instruction is found to have misled a reasonable juror, *Francis v. Franklin* (1985), 471 U.S. 307, 315–16, 105 S.Ct. 1965, 1972, 85 L.Ed.2d 344, 354, the erroneous instruction should be viewed in the context of the entire proceedings and "the question is ... whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten* (1973), 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368, 374. In *Cupp*, a case in which the defendant offered no testimony on his behalf, the Court upheld an instruction which stated witnesses are presumed to testify truthfully but that the presumption

may be rebutted. The Court rejected the defendant's argument that the instruction impermissibly shifted the burden of proof to the defendant to prove his innocence. *Id.* at 148, 94 S.Ct. at 401, 38 L.Ed.2d at 374. In *United States v. Frady* (1982), 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816, the Supreme Court held an erroneous jury instruction regarding malice was not sufficiently prejudicial to reverse a defendant's conviction for first degree murder:

Should any doubt remain, our examination of the jury instructions shows no substantial likelihood that the same jury that found Frady guilty of first-degree murder would have concluded, if only the malice instructions had been better framed, that his crime was only manslaughter. The jury, after all, did not merely find Frady guilty of second-degree murder, which requires only malice. It found Frady guilty of first-degree—deliberate and premeditated—murder.

*Id.* at 172, 102 S.Ct. at 1596–97, 71 L.Ed.2d at 833.

■ In applying these rules to the State's application for death penalty here, we cannot say that the erroneous inclusion of the word "knowingly" in the application infected the entire trial that Hough's penalty violates due process. At the same time he quoted the incorrectly worded application, the trial judge correctly quoted IC 35–50–2–9(b)(1) which requires an intentional killing for it to be an aggravator. Additionally, the emphasis in the prosecutor's closing argument was on the cold and calculated manner in which Hough murdered his victims. The record clearly supports a finding that Hough intentionally killed his victims. Furthermore, the jury had two other aggravating circumstances which would support their recommendation pursuant to IC 35–50–2–9(b)(7) and (8). In light of the entire instructions and the evidence at trial and sentencing, it does not seem likely that a reasonable juror would be misled by the application for death sentence as read.

The trial court is affirmed and this cause is remanded to the trial court for the purpose of setting a date for the imposition of the death penalty.

GIVAN, J., concurs.

SHEPARD, C.J., concurs in result with separate opinion.

DeBRULER, J., concurs in result and dissents with separate opinion.

DICKSON, J., concurs and dissents with separate opinion.

SHEPARD, Chief Justice, concurring in result.

I agree with most of the analysis in the plurality opinion but believe that it leaves unresolved the very first issue under discussion—victim impact. Justice Pivarnik notes that Hough did not object to the prosecutor's reference to letters from the victim's family and his introduction of family members in open court during the sentencing hearing before Judge Meyers. The plurality opinion notes that failure to object waives the issue on appeal unless there was error so fundamental as to warrant excusing the failure. It proceeds to analyze the merits of Hough's victim impact argument and concludes: "No error is presented on this issue." To this I would add, because there is no fundamental error, the issue is waived.

I join in affirming the judgment of the trial court.

DeBRULER, Justice, concurring in result and dissenting.

In this case, appellant was convicted in an earlier trial of the murder of one Bartkowiak. This conviction should not be deemed sufficient to show an aggravating circumstance under I.C. 35–50–2–9(b)(7), which sets out such circumstance as "The defendant has been convicted of another murder," because it occurred after the murder of Rubrake and Bosler. In *Thompson v. State* (1986), Ind., 492 N.E.2d 264, 270, this Court expressed a non-binding opinion that in order for this aggravator to exist, "the prior conviction must have existed at the time of commission of the principal murder charged." Under this rationale, the aggravator identifies one who was not deterred from killing other human beings by the experience of having been previously subjected to a trial and conviction for murder. I would elevate this non-binding interpretation to a binding status in this case. Since the Bartkowiak conviction stands as an improper aggravator among several of the aggravating circumstances considered by the jury and was relied upon by the court in giving a single aggravating weight, I would, on this basis, order the sentence of death set aside.

The sentence of death was supported by the court's statement that "[t]he aggravating circumstances outweigh any mitigating circumstances that exist and warrant the death penalty." At the sentencing in court and in the court's sentencing order, the specific aggravating circumstances are fully stated; however, there is no explanation of what mitigating circumstances may have been considered and evaluated. Despite the strong indications in support of an aggravating circumstance, namely, the proof that appellant was the triggerman in the killing of two men, there must be specific written findings describing aggravating and mitigating circumstances found to exist. *Judy v. State* (1981), 275 Ind. 145, 416 N.E.2d 95. There is nothing in this record, as there was in *Judy*, showing that the sentencing court parcelled out the evidence of mitigating circumstances into discrete categories and then simply did not recite them in the written findings. I would not, therefore, as was done in *Judy*, remand for an inclusion of such acts of judgment in the sentencing order, but instead would set aside the sentence of death and order a new sentencing hearing before the court, or in lieu thereof, the imposition of sentences for years. I do, however, vote to affirm the convictions.

Further, I believe that in a case such as this where irrelevant and highly prejudicial matter was received at the sentencing hearing and where the judge's written statement is silent as to whether it was considered in making the determination that the death penalty be imposed, the case should be remanded to the trial court with an order that he clarify what impact, if any, this matter had on his decision to sentence the defendant to death. The employment of a remand process, especially in these circumstances, is in accord with my views recently expressed in a separate opinion in *Coleman v. State* (1990), Ind., 558 N.E.2d 1059 (DeBruler, J., concurring in result and dissenting).

DICKSON, Justice, concurring and dissenting.

While concurring as to the conviction, I agree with Justice DeBruler that the sentencing statement was not adequate in its discussion of mitigating factors, but I would remand for a new sentencing evaluation and order by the trial court.

Furthermore, I disagree with the appellate standard and methodology utilized by

Justice Pivarnik in his review of jury instructions in the death penalty hearing.

In reviewing the impact of an erroneous instruction, the standard employed by the plurality opinion is whether it seems likely "that a reasonable juror would be mislead." Such standard unacceptably risks imposition of the death penalty when there is a substantial possibility, though not probability, that reasonable jurors have applied an incorrect instruction.

The proper standard is provided in *Mills v. Maryland* (1988), 486 U.S. 367, 377, 108 S.Ct. 1860, 1867, 100 L.Ed.2d 384, 395–396:

> Unless we can rule out the substantial possibility that the jury may have rested its verdict on the "improper" ground, we must remand for resentencing.

While concluding under the facts that there was actually a substantial probability that reasonable jurors may have misunderstood the death penalty instruction, the *Mills* Court expressly cautioned:

> The *possibility* that petitioner's jury conducted its task improperly certainly is great enough to require resentencing. [emphasis added].

486 U.S. 367, 384, 108 S.Ct. 1860, 1870, 100 L.Ed.2d 384, 399.

## ON PETITION FOR REHEARING

PIVARNIK, J.

In *Hough v. State* (1990), Ind., 560 N.E.2d 511, this Court issued an opinion affirming Kevin Hough's conviction of Murder and imposition of the death penalty. In his petition for rehearing Hough challenges the Court's resolution of Issues II and III, relating to: (1) his request for appointment of a ballistics expert to aid counsel in cross-examining the State's witness, and (2) admission into evidence of Exhibits 4, 5 and 6, the spent shell casings found at the scene of the murder. Hough's arguments on rehearing parallel those made on direct appeal and, because we see no merit to his contentions, we reject them for the reasons set forth in our original opinion. *Id.* at 516–18.

However, we note *sua sponte* an error which requires correction. We originally remanded this case to the trial court with directions to set an execution date. This contradicts Ind.Crim.Rule 24(G) which states: "No execution date shall be set until appellate proceedings, including a petition for a writ of certiorari to the Supreme Court of the United States, if sought, are concluded." Pursuant to this Rule, we now grant rehearing for the limited purpose of instructing the Allen Superior Court, Criminal Division to withhold setting an execution date until notified by the State that appellate proceedings are concluded. Hough's conviction and sentence of death are otherwise affirmed.

DeBRULER, J., dissents without separate opinion.