Marvin D. CASTOR, Appellant,

v.

STATE of Indiana, Appellee.

No. 89S00–9006–DP–409.

Supreme Court of Indiana.

March 2, 1992.

Keith A. Dilworth, Charles R. Hyde, Jr., Horn & Hyde, Richmond, for appellant.

Linley E. Pearson, Atty. Gen., Arthur Thaddeus Perry, Deputy Atty. Gen., Indianapolis, for appellee.

KRAHULIK, Justice.

Defendant–Appellant Marvin D. Castor was convicted by a jury of murder and carrying a handgun without a license. Because the death penalty was sought, the jury was reconvened and, after hearing evidence and argument of counsel, recommended that the death penalty be imposed. The trial court entered a detailed sentencing order which ultimately found that Castor should be executed. This direct appeal followed.

Castor alleges the following errors:

(1) The trial court erred by denying Castor's request for individual *voir dire* and sequestration of jurors during *voir dire*.

(2) The trial court erred in admitting gruesome photographs and inflammatory items of tangible evidence.

(3) The trial court erred in dismissing a prospective juror for cause.

(4) The trial court erred in repudiating certain precautions requested by Castor to foster the selection of an impartial jury.

(5) The trial court erred in denying and, during sentencing, granting Castor's request to proceed *pro se*.

(6) Castor was denied a fair trial because he was denied his right to present his defense.

(7) The trial court erred in denying Castor's request for a defense psychologist.

(8) The State's request for the death penalty was based upon an invalidly-charged aggravating circumstance.

(9) Castor was improperly sentenced to death in violation of the United States and Indiana Constitutions.

Having reviewed the transcript in light of the alleged errors, we affirm Castor's conviction for murder but reverse the trial court's sentencing of Castor to death.

## FACTS

The facts which support the jury's verdict follow. In May 1986, Castor was an employee of the Sugar Creek Resort, located near Greenfield, Indiana. Sugar Creek Resort was affiliated with a business entity generally referred to as Collett Ventures. Castor was a salesman and "contract closer" for Sugar Creek Resort. Castor's brother, Gerald Castor, also was an employee of Sugar Creek Resort, working in the capacity of a collections manager. On May 5th, Castor, his brother Gerald, and one Mark Barmes reviewed documents which Gerald had obtained from Collett Ventures. The three concluded that such documents indicated that the employer was engaged in defrauding lending institutions and, after much discussion concerning the course of action to be taken with this damaging information, Castor determined that he would approach his employer in order to request $250,000 in exchange for this information. Barmes, who was studying to become a paralegal, told Castor in substance that this plan was illegal in that it constituted blackmail. After being told that Castor was going to proceed with the plan, Barmes withdrew and participated no further.

On May 6th, Castor, in a meeting with Bill Collett, Jr., his superior at Collett Ventures, demanded payments of $30,000 and $250,000 in exchange for the alleged damaging information that he had garnered from the company's records. After Castor left his office, Collett reported this extortion attempt to the Hancock County Sheriff's office which, in turn, reported it to the Federal Bureau of Investigation. The next day, May 7th, the FBI recorded telephone conversations between Castor and Collett Ventures during which Castor stated that he believed that Collett Ventures had sent "hit men" to his house and intended to injure him. Castor also stated that he was "armed to the teeth" and that these "hit men" would not intimidate him. Throughout those phone conversations, Collett Ventures, through two representatives, informed Castor that there were no "hit men" after him, but that his extortion attempt had been reported to the police. Additionally, during those phone conversations, Castor and Collett Ventures' representatives discussed amounts, methods and locations for payment of the money Castor demanded.

Castor presented evidence that after his meeting with Collett on May 6th, two men had been reported looking for him at his house and that he later determined that his house had been broken into and ransacked. It is undisputed that on the evening of May 6th Castor and his brother Gerald purchased a box of shotgun shells, a .357 Smith & Wesson handgun, and a .22 revolver. Early the next morning, on May 7th, Castor purchased ammunition for the .357 Smith & Wesson handgun and, after loading it, placed it in his briefcase which he kept next to him in the cab of his pickup truck. Throughout the day of May 7th, Castor and the two representatives of Collett Ventures continued to discuss, by telephone, the arrangements for the payment of money by Collett Ventures to Castor. They finally agreed to a time and place for the exchange of money and documents.

As agreed, at approximately noon on May 8th Castor, in his pickup truck, and Gerald, in his automobile, waited at an Amoco station on State Road 9 immediately north of Interstate 70 for Bill Collett, Jr., to pay the money demanded by Castor. While Castor was waiting at the station inside of his truck, Malcolm Grass, a Hancock County deputy sheriff, and other FBI law enforcement personnel arrived in several different cars to arrest Castor and his brother for extortion. None of the law enforcement personnel were in uniform and all arrived in unmarked automobiles. The automobile in which Malcolm Grass was riding, as a front seat passenger, was driven so that it was nose-to-nose with Castor's truck, thereby blocking Castor's escape route. Grass and the driver of his car pulled their weapons and exited their vehicles. Castor exited his truck with the .357 Smith & Wesson revolver in his hand. Grass and Castor faced each other from a distance of approximately five feet. The witnesses' accounts vary as to when and with what force the law enforcement officers announced that they were either police or FBI. One officer, driving another unmarked car several feet away, wore a hat with the letters FBI on it. According to all of the witnesses, this was the only visual identification that any of the law enforcement personnel were, in fact, law enforcement personnel.

Almost immediately, as Grass and Castor faced each other, Castor fired at least two and possibly three bullets at Grass as Grass and Castor retreated behind their respective vehicles. Castor ultimately fired all five rounds of ammunition from his gun. Although Grass did not return Castor's fire, the FBI agents on the scene did. Castor ultimately surrendered and stated to the arresting FBI agents that he believed that they were "hit men". Ballistics and autopsy later determined that Grass died from one of Castor's ricochet bullets which struck him in the head. The State charged Castor with murder and asked for the death penalty because the victim of the murder was a law enforcement officer who was acting in the course of duty.

At trial, the State adduced evidence that the victim and others had announced themselves as law enforcement officers before

Castor shot. Additionally, the State presented two witnesses who testified that, while they were incarcerated with Castor in jail, he admitted to them that he recognized Malcolm Grass as a law enforcement officer at the time of the shooting. Based on this evidence, the State contended that Castor knew that he was shooting at a law enforcement officer.

On the other hand, Castor defended his action at trial on the basis of a mistake of fact and self-defense. Castor contended that he believed that Collett Ventures was a "Mafia" organization and that, after his conversation with Bill Collett on May 6th, two hit men were flown to Greenfield in order to harm Castor and his family. Castor further contended that at the time of the shootout with the plainclothes police officers in unmarked cars, he thought that he was shooting at such hitmen and, therefore, was acting in self-defense.

### I. Individual Sequestered Jury Voir Dire

■■■ Castor urges that the trial court erred in denying his request for individualized sequestered *voir dire* of prospective jurors. His motion, filed with the trial court, contained an affidavit from a psychologist in which it was opined that "the only possibility of obtaining a fair trial would be through extensive, open-ended, attorney-conducted sequestered *voir dire*." In fact, Castor contends that during the *voir dire* itself, a potential juror infected the entire panel when he stated that his brother-in-law was a good friend of Malcolm Grass's and that "from what he had already heard, the man's guilty." While Castor acknowledges that such juror was excused, he urges that the infectious harpoon had already been planted. Castor also acknowledges, as the record reveals, that the trial judge exercised his discretion during *voir dire* when he referred a question to the pool of prospective jurors as to whether any of them had acquired knowledge of events regarding this case from newspaper articles, radio reports, television news, or from anyone else who claimed to know anything about these events. In response to this inquiry, four prospective jurors answered in the affirmative, prompting the trial judge to ask the balance of the prospective jurors to step outside of the courtroom while the four prospective jurors were questioned in greater detail concerning their knowledge. All four were, ultimately, excused.

Having acknowledged that the trial judge has a wide range of discretion in determining whether to grant a request for individual *voir dire* and sequestration of jurors during *voir dire*, Castor maintains that he was denied a fair and impartial jury by the trial court's refusal to grant his motion. We disagree.

This Court consistently has rejected the notion that individualized, sequestered *voir dire* is required in any case, death penalty cases included. *Conner v. State* (1991), Ind., 580 N.E.2d 214, 217; *Lowery v. State* (1989), Ind., 547 N.E.2d 1046, 1049, *cert. denied* (1990), —— U.S. ——, 111 S.Ct. 217, 112 L.Ed.2d 176. In this case, the trial judge exercised his discretion and adopted a procedure in which four jurors who acknowledged having outside information concerning this case were sequestered for individual *voir dire* which resulted in their being excused. The only potentially prejudicial statement pointed to by Castor is that of the juror whose brother-in-law knew the deceased and who felt that Castor was guilty. The court immediately called counsel to the bench and excused that juror from further duty. We do not perceive that the juror's statement infected the jury panel so as to deprive Castor of a fair jury and a fair trial. Voir dire was not conducted erroneously.

### II. Admission of Photographs and Allegedly Inflammatory Tangible Evidence

■■■ While conceding that the admission of evidence is governed by the sound discretion of the trial judge, Castor nevertheless argues that the admission into evidence, over objection, of photographs and/or slides which graphically depicted the decedent's injury was an abuse of discretion requiring reversal. Suffice it to say that we have examined such evidence and hold that such exhibits were material

and relevant to prove the trajectory and physical identity of the bullet which caused death as coming from the gun of Castor. They were properly admitted. *Fisher v. State* (1989), Ind., 541 N.E.2d 520, 523; *Drollinger v. State* (1980), 274 Ind. 5, 18, 408 N.E.2d 1228, 1237.

### III. *Dismissal, For Cause, Of Prospective Juror and Trial Court's Conduct of Voir Dire*

 Castor urges that a prospective juror was improperly dismissed in violation of *Witherspoon v. Illinois* (1968), 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, because a prospective juror must make it unmistakably clear that such juror would automatically vote against the death penalty, regardless of the facts, in order to justify a challenge for cause. The State correctly points out that the standard which we must use in reviewing the trial court's granting of a challenge for cause of a prospective juror is whether the juror's views would prevent or substantially impair the juror's performance of duty in accordance with the court's instructions and the juror's oath. *Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841; *Underwood v. State* (1989), Ind., 535 N.E.2d 507, *cert. denied* (1989) 493 U.S. 900, 110 S.Ct. 257, 107 L.Ed.2d 206. Here, the prospective juror stated that he did not feel that he could judge guilt or innocence irrespective of penalty, and that he might raise the State's burden of proof so high as to not be able to give the State a fair trial. Further, he stated that he could not take an oath to render a verdict based on the law and the evidence, and could not accept the law's definition of reasonable doubt and apply it to the evidence. We agree with the State that these answers justified a finding that the prospective juror's views substantially impaired his ability to perform the duties of a juror in accordance with the court's instructions and his oath. The trial court did not abuse its discretion in excusing this juror for cause.

Castor also argues that the trial court erred in discharging prospective jurors from sitting on the jury when such jurors made it unmistakably clear that they would either automatically vote against the death penalty in spite of the evidence or that they could not impartially render a judgment at the guilt-innocence phase. He contends that he timely objected to the excusal of these jurors for cause based upon the assertion that the systematic exclusion of such jurors who oppose the death penalty "death qualifies" a jury so that it would be prone to convict and to render a death sentence recommendation. Our review of the transcript convinces us that the trial court properly excused these jurors who stated that they could not follow the law or could not render an impartial verdict in the case. The goal of the jury selection process is to grant to both sides a procedure to obtain an impartial jury that can render a verdict based on the law and the evidence. Here, the trial court's proper exercise of discretion achieved that goal. We see no error.

### IV. *Castor's Request for Funds for Social Psychiatrist*

 Counsel for Castor filed four separate motions requesting funds for the appointment of experts in the field of social psychology. The motions requested funds in order to conduct scientific experiments, such as a telephone survey and an audio-trial simulation for a moot jury, in order to demonstrate a difference in the attitudes and characteristics of death-qualified jurors from those who are not death-qualified. These motions were all denied. Castor does not present cogent argument as to why he believes the trial court erred in denying such motions. Therefore, any error in denying such motions is waived. *Goliday v. State* (1988), Ind., 526 N.E.2d 1174, 1175. Additionally, however, we perceive no error in the trial court's denial of these motions.

### V. *Constitutional Right to Proceed Pro Se*

 Toward the conclusion of the guilt-innocence phase of the trial, Castor asserted a request that he be permitted to do a portion of the summation *pro se*. The trial court, after properly questioning Castor, denied the request. At the beginning

of the penalty phase of the trial, Castor again moved for *pro se* representation and again the trial court denied the request. At the beginning of the sentencing phase, however, the court granted Castor's third request to proceed *pro se*. We hold that the trial court acted correctly on each request.

Castor, according to the record, finally acquiesed in his counsel's doing the summation. Secondly, Castor concedes on appeal that his request to proceed *pro se* during final argument of the guilt-innocence phase and during the penalty phase may not have been timely. However, argues Castor, under the peculiar circumstances of his case, it was within the trial court's discretion to grant said requests. We agree, but hold that the trial court correctly denied such requests. *Broadus v. State* (1986), Ind., 487 N.E.2d 1298, 1304; *Koehler v. State* (1986), Ind., 499 N.E.2d 196, 198.

 Castor contends that he should have been allowed to proceed *pro se* on appeal. There is no citation of authority in support of this argument and, thus, such argument is waived. *Goliday*, 526 N.E.2d at 1175. Additionally, however, the record reveals that the trial court explicitly referred to defendant's right to file his own *pro se* motion to correct errors and, in granting counsel's motion for leave to file a belated motion to correct errors, specifically stated that defendant could file his own motion *pro se*. Finally, the court granted both counsel and Castor 90 days from that date to file a motion to correct errors. Castor did not avail himself of the opportunity to file a *pro se* motion nor did he file a brief or attempt to file one. The record does not support Castor's conclusion that the trial court denied him his right to proceed *pro se*. As the State correctly points out, Castor's own inactivity denied him this opportunity.

Having previously argued that the court improperly denied him the right to proceed *pro se* during summation and the penalty phase of the trial, Castor urges us to hold that the court further erred in permitting him to proceed *pro se* at the sentencing

hearing. Because we are reversing the sentence and remanding for a new sentencing procedure, we need not decide whether the trial erred in permitting him to proceed *pro se*.

## VI. *Denial of the Right to Present a Defense*

 Castor urges this Court to find that he was denied a fair trial because the trial court improperly excluded evidence which was germaine to Castor's defense theory. Castor points to the trial court's sustaining objections to Castor's cross-examination of FBI agents concerning whether the FBI agents had "heard" from some source that Castor believed that hit men were after him. Additionally, Castor argues that he should have been allowed to testify about his brother's financial arrangement with Collett Ventures; that *in his mind*, all of the managerial types at Collett Ventures fit the typical profile of an organized crime type; and about the Collett Ventures company records and the facts contained in such records. Castor urges that the court's actions in excluding this evidence deprived him of a fair trial because such evidence was central to his state-of-mind/self-defense/mistake-of-fact defense. In answer to this alleged error, the State correctly points out that almost all of the assertions and statements sought to be proven by Castor's excluded evidence was admitted during Castor's testimony and the testimony of other defense witnesses as well as witnesses called by the State in rebuttal.

In reviewing the totality of the transcript, it is this Court's opinion that the trial judge ruled correctly on excluding this evidence in the manner in which it was offered. Additionally, the transcript reveals that all of the evidence which the trial court may have excluded on cross-examination was ultimately received by the jury either during Castor's case in chief or the State's rebuttal evidence. Castor was permitted to present evidence supporting his defense that he believed that hit men were pursuing him. Further, he was allowed to introduce evidence regarding the reasons for his misperception. We believe that the

jury was well informed concerning all facts of the case and that Castor was not denied the ability to present a defense by the court's exercise of its discretion in controlling the presentation of evidence and the cross-examination of witnesses.

We hold that Castor received a fair trial and that the jury's verdict finding him guilty of murder was based upon a review of the totality of the circumstances surrounding the killing. We deny Castor's assertions to the contrary.

### VII. Denial of Request for Defense Psychologist

Castor, on October 2, 1986, filed an application to employ a defense psychologist. This request was reiterated in a pleading entitled Motion in Support of Defense's Motion to Authorize the Employment of Defense Psychologist filed February 26, 1987. In this motion, counsel for Castor stated that he had discussed the case with a psychologist and had reiterated to the psychologist certain facts which had been revealed by counsel's investigation as well as the discovery materials provided to defense counsel. The motion stated that, based upon this information, the psychologist had indicated that, in her opinion, Castor "may have been under the influence of extreme mental or emotional disturbance when he committed the acts alleged in the information as covered by § 35–5–2–9(C)(2)." The motion additionally set forth the hourly rate and maximum charge of the proposed psychologist. The motion was denied on June 4, 1987.

 We begin our analysis of this issue by noting that both the October 2, 1986, and February 26, 1987, motions requested the defense psychologist for the penalty phase of the trial. For the first time, in his brief to this Court, Castor argues that the denial of his request for a defense psychologist affected not only the penalty phase of the trial but also the guilt-innocence phase because, he argues, without a timely inquiry, he was not able to evaluate possible defenses, whether or not to proceed to trial, or whether or not to enter into plea negotiations with the State. We reject the claim that the court's denial of a defense psychologist requires reversal of Castor's conviction for murder because, as this Court has previously stated in Hough v. State (1990), Ind., 560 N.E.2d 511, 516, a trial court does not abuse its discretion in rejecting an indigent's request for appointment of an expert witness when the purpose for such employment appears to be exploratory only. Here, as in Hough, at no time did Castor claim that he was either insane at the time that the crime was committed or that he was incompetent to assist in his defense at trial. Therefore, the trial court did not abuse its discretion in refusing the request for employment of a defense psychologist concerning the guilt-innocence phase of the trial.

 We are persuaded, however, that the trial court did abuse its discretion in denying Castor's application for a defense psychologist to assist him in defending himself during the penalty phase of the trial. Castor's motion of February 26, 1987, stated in effect that a psychologist had opined that, given the facts as related to her by defense counsel, Castor may have been under the influence of extreme mental or emotional disturbance when he committed the acts alleged in the information. One of the statutory mitigators which both the jury and the trial judge must weigh during the penalty phase of the trial is whether the defendant "was under the influence of extreme mental or emotional disturbance when he committed the murder." Ind.Code Ann. § 35–50–2–9(C)(2) (West Supp.1991). In view of the showing made in the February 26, 1987, motion, it was incumbent upon the trial court to allow Castor appropriate resources to develop the opinion of this expert witness concerning this statutory mitigator. The failure of the trial court to approve the expenditure of the funds necessary to further develop this opinion was erroneous and requires reversal of the death penalty.

The State, during oral argument before this Court, pointed out that following the jury's recommendation that Castor be sentenced to death, but before the trial court conducted the actual sentencing hearing, the trial court did order a psychiatric exam-

ination of Castor. Therefore, the State argued, any error in refusing the employment of a defense psychologist was cured by such court-ordered psychiatric examination. The record, however, reveals that the trial court only requested a psychiatric examination to determine Castor's present mental competency and legal ability to be sentenced and "retroactively with respect to defendant's ability to have understood these criminal proceedings, particularly the trial of defendant which was conducted from March 14, 1988, to March 27, 1988, and to have assisted in the preparation of the defense thereto." Surely this examination was quite different from that which Castor had requested in his February 26, 1987, motion relating to determining whether he was under the influence of extreme mental or emotional disturbance when he committed the murder. We do not believe that the trial court's pre-sentencing order for a mental examination cured or rendered harmless the earlier error in refusing to allow Castor to employ a defense psychologist under the circumstances as set forth above.

VIII. *Validity of the Charged Aggravating Circumstance Upon Which the Request for Death Sentence Was Premised*

Castor argues that, in order to impose the sentence of death for the murder of Malcolm Grass, the State must have proven that Castor, in fact, *knew* that the victim was a law enforcement officer. Castor argues further that the sentence of death could not be imposed on him if he held the good faith belief that Malcolm Grass was not a law enforcement official. The State, on the other hand, cites *Moore v. State* (1985), Ind., 479 N.E.2d 1264, 1275, *cert. den.* (1985) 474 U.S. 1026, 106 S.Ct. 583, 88 L.Ed.2d 565, for the proposition that the death penalty can be imposed where the defendant either knew or should have known that his victim was a law enforcement official. Here the jury was instructed that it should determine whether the State has proved beyond a reasonable doubt all of the elements of the aggravating circumstances alleged by the State, including whether "at the time the defendant killed Malcolm Grass the defendant knew or reasonably should have known that Malcolm Grass was a law enforcement officer."

It is true that *Moore* stands for the proposition espoused by the State. However, the facts in this case are markedly different from the facts in *Moore.* In *Moore*, the law enforcement officer was wearing his official, distinctively-marked uniform with a badge and radio clipped to the front of his shirt when he knocked on the door and was shot by the defendant. This Court held that the evidence in that case "clearly established that appellant had the ability and a timely opportunity to ascertain that his victim was a law enforcement officer acting in the course of his duty" and that Moore "forfeited his standing to complain that he did not know that his potential victim was a police officer when [he] did not take advantage of the opportunity he had to become so informed." 479 N.E.2d at 1276. Justice DeBruler, in his dissent to *Moore*, set forth the rationale for requiring that the ultimate sentence of death be imposed only where there is a determination that the defendant knew that his victim was a law enforcement official. Justice DeBruler said:

> The policy at the base of the exercise of the police power here is to create a special deterrence to the direction of physical force against police officers and others upon whom the security of the community depends. There are at least two essential states of mind referred to in the provision, the one required for murder plus an awareness of the official status of the target. The first is within the meaning of the term "murder" and the second is within the special official status terms. The purpose of the statute restricts it to instances in which the attacker knows he is dealing with one of the enumerated officials. Such knowledge of official status must be actual. Actual knowledge is, I am convinced, intended by the legislature.... I consider the reasonable discernment test applied by the majority to be contrary to legislative

intent and basic precepts of criminal law governing standards to select those who deserve death as a penalty for crime. *Id.* at 1283. Further, in *Moore*, Justice Pivarnik, writing for the majority, held that the majority was deciding that case based upon the facts of that case and stated that "we will not decide this case merely on the basis of his abstract arguments." *Id.* at 1276.

■ This case does not present a set of hypothetical facts or abstract arguments, but presents this Court with the question of whether to affirm the imposition of the sentence of death in the case of the murder of an unmarked, plainclothes law enforcement official without a finding from either the jury or the sentencing judge that Castor, in fact, knew that his victim was a law enforcement official. We believe that the societal rationale for imposing death for one who kills a law enforcement official is promoted only if the defendant knew that the victim was a law enforcement official at the time of the killing. Because the jury was instructed that it could recommend the death penalty if it found that Castor "should have known" that Grass was a law enforcement official, its recommendation to the trial court that death be imposed was premised on an incorrect instruction of law. Additionally, the sentencing court, in its well-reasoned sentencing order did not find beyond a reasonable doubt that Castor, at the time he shot and killed Malcolm Grass, knew that he was shooting at a law enforcement official. The case must be resubmitted for jury recommendation and trial court sentencing utilizing the principle of law that a defendant can only be sentenced to death for murdering a law enforcement officer if the trier of fact is convinced beyond a reasonable doubt that, at the time of the shooting, the defendant knew that he was shooting at a law enforcement officer.

## IX. *Sufficiency of the Evidence*

■ Castor urges that the evidence was insufficient to support the finding of proof of a sole aggravator beyond a reasonable doubt in violation of the United States and Indiana Constitutions. He argues that the evidence at the trial was insufficient to show that he knew that Malcolm Grass was a law enforcement officer acting in the course of his duty. Although we are reversing the death sentence and remanding for a new sentencing procedure, we still must determine whether the evidence is sufficient to support a determination that Castor knew that Malcolm Grass was, in fact, a law enforcement officer. As we have previously stated, the evidence adduced at trial which was then incorporated into the penalty phase was that the police officers announced themselves as police officers or FBI at the time of the shooting. Additionally, two witnesses who were incarcerated with Castor testified that Castor admitted to them that he knew that Malcolm Grass was, in fact, a law enforcement officer because he had had previous dealings with Grass. We hold that this evidence is sufficient for a jury to determine beyond a reasonable doubt that Castor knew that the victim was a law enforcement officer. Therefore, an order remanding the case for a new sentencing determination as opposed to ordering a term of years is appropriate. Additional arguments have been raised by Castor under this heading, but, in view of our ruling, we need not decide such issues at this time.

### CONCLUSION

For the reasons set forth above, we hereby affirm Castor's conviction for murder, but reverse the sentence of death and remand this case to the trial court for a new penalty phase trial and sentencing procedure consistent with this opinion.

DeBRULER and DICKSON, JJ., concur.

SHEPARD, C.J., concurs in affirming conviction, but dissents as to reversing the penalty.

GIVAN, J., concurs and dissents with separate opinion.

GIVAN, Justice, concurring and dissenting.

I respectfully dissent from the majority opinion's observation that the statement by

Justice DeBruler in his dissenting opinion in *Moore v. State* (1985), Ind., 479 N.E.2d 1264, *cert. denied,* 474 U.S. 1026, 106 S.Ct. 583, 88 L.Ed.2d 565, is the law in Indiana today. In many instances it is virtually impossible to tell what is in the mind of the perpetrator at the time he acts. The only logical basis upon which the State may proceed in such an instance is to establish the fact that the actor either knew or should have known the person he killed was a police officer.

In the case at bar, as pointed out by the majority opinion, FBI agents testified at the trial that they clearly announced to appellant at the time they confronted him that they were FBI agents. This is certainly a factual situation from which any reasonable person could deduce that appellant should have known they were police officers. I know of no scientific method to pry into appellant's mind as to what he actually believed at the time.

I agree with the majority opinion that appellant should have been afforded a psychologist at the penalty phase of the trial to present evidence as to his mental state at the time of the shooting. I agree that his mental state would not be a defense to the shooting but possibly could be a mitigating circumstance which might avoid the death penalty. I therefore agree that we should remand this case to the trial court for a retrial of the penalty phase.

I would delete from the majority opinion the dictum that the State must present absolute proof that appellant knew he was shooting at a police officer at the time he fired the shot. The statute is satisfied when the State presents evidence that a defendant should have known he was shooting at a police officer at the time he fired the shot.