Christopher M. STEVENS, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 79S00–9507–DP–828.

Supreme Court of Indiana.

Dec. 31, 1997.

Rehearing Denied March 31, 1998.

Brent Westerfeld, Indianapolis, Jeffrey A. Baldwin, Indianapolis, for Appellant.

Jeffrey Modisett, Attorney General, Geoff Davis, Deputy Attorney General, Indianapolis, for Appellee.

SHEPARD, Chief Justice.

Christopher M. Stevens was tried before a jury and convicted of murdering ten-year-old Zachary Snider. The jury recommended death. The trial judge found that the State had proved three aggravating circumstances and that these outweighed the mitigating circumstances. He sentenced Stevens to death. We affirm.

### Facts

On February 17, 1993, the Marion Superior Court, after a jury trial, sentenced Christopher Stevens to four years for child molestation, with one year executed and three years suspended to probation. Stevens was released from the Marion County jail on probation in May 1993, and went to live at the home of his father in Stardust Hills, a subdivision located in Cloverdale, Indiana. On the night before he was released, Tracy Easton, a fellow inmate also incarcerated for child molesting, told Stevens he would be back in jail in two months. Stevens replied, "No, I won't. Next time I'll kill him." (R. at 4587–88.)

Zachary Snider lived with his parents and sister, also in Stardust Hills, about one-quarter mile from Stevens. During the early summer of 1993, Stevens attended at least one of Zachary's Little League baseball games, videotaped it, and offered money to anyone on the team who could hit a home run. On one afternoon in mid-June, Stevens and Zachary asked for and received Zachary's father's permission to go fishing. A little later, when Mr. Snider realized that the two were not at the pond located within Stardust Hills, he went looking for them. Upon finding them at a pond located outside of the subdivision, Zachary's father informed them both that Zachary was not to be in Stevens's car and that Stevens was to stay away from his son.

On July 15, 1993, Zachary left home about 11 a.m. and rode his bike to the home of his playmates, Alex and Andrew Krouse. They lived across the street from Stevens. At about 1:30 p.m., Zachary phoned his father to say he was then at the Krouse's but would soon be coming home. According to Alex Krouse, Zachary looked across the street at Stevens' house before he departed and said, "Good, Chris is home," and that he was going over there. (R. at 4102–03.) As Zachary rode down Krouse's driveway, Krouse went back into his house. A few minutes later, as Krouse and his mother left their home by car, Krouse noticed Zachary's bike parked in Stevens' yard.

According to Zachary's father, Zachary arrived home at approximately 2:30 p.m. The boy spoke to his father for a few minutes in their garage, gave his father some mowing money he had collected on his way home, and then went inside. Shortly thereafter Mr. Snider went inside to look for Zachary, but the boy had already left on his bicycle.

Later that afternoon Mark White, Stevens' fifteen-year-old neighbor, received a call from Stevens asking for White's immediate assistance in pushing a trailer back into Stevens' garage. White went over and helped Stevens, and then returned to his own home.

When Zachary did not arrive home at dinner time, which was around 7 p.m., the Sniders began searching the neighborhood. After a while they engaged the help of Alex and Andrew Krouse's parents, the Rumleys. During this search, the Rumleys encountered Stevens in front of his house. When asked, Stevens informed them that he had been asleep until 3:00 or 3:30 p.m. and had not seen Zachary all day. Finally, at 9 p.m. Mr. Snider called the police. At about 9:15 p.m., Stevens arrived at the Sniders' home, "made reference to having seen the police and wanted to know what was going on." (R. at 4169.) Stevens left soon after, but came and went to the Sniders' residence numerous times that evening, the final visit being around midnight. The next morning Stevens again showed up at the Sniders' home and inquired about their search for Zachary. He requested some of the flyers that Mr. Snider had printed up the previous evening for distribution. That day, Stevens and fifteen-year-old Jason Byrns, another resident of Stardust Hills, drove around searching for Zachary and passing out Snider's flyers. At one point

during the trip Stevens said to Byrns, "I wonder where Zachary can be?" (R. at 4222.)

By July 17, several hundred people, including police officers from various agencies, members of the volunteer fire department, and civilians, were engaged in a massive search for Zachary. At one point state police officers were outside the Snider residence when Stevens drove past. The officers approached the car and asked Stevens for an interview. Stevens agreed and followed the officers to the Putnamville state police post. When questioned, Stevens initially reported the same story he had previously told the Rumleys about sleeping until the afternoon of July 15th and having not seen Zachary that day. He did, however, state that Zachary may have knocked on his door while he was sleeping, but that he did not answer it. When the police informed Stevens that Zachary's bike had been seen parked outside of Stevens' house that day, Stevens became agitated and began to leave. One of the officers, however, talked Stevens into returning and continuing with the interview.

During this continued portion of the interview, which the police tape-recorded, Stevens stated that Zachary had arrived at his house shortly after 4 p.m. He claimed that Zachary visited for five or ten minutes, during which time Zachary confronted Stevens with a rumor he had heard about Stevens sleeping with Zachary's mother, which Stevens denied. Stevens said Zachary then left, claiming he would soon be picked up by a friend who was to give Zachary a ride to an uncle's house. When asked why he had previously denied seeing Zachary on the day of his disappearance, Stevens replied, "I didn't want anybody thinkin' that *I* had done somethin', because I hadn' done anything, and, and I figured that if I told you guys that, that you guys would think that *I*'d done somethin', and I didn'." (Audio tape of interview, Ex. 9.) Asked at the end of the interview whether he had anything else to say, Stevens replied, "No, not other than, 'I didn' do anything.' " (*Id.*)

On the night of July 19, Stevens drove to the home of his older brother, Mark Stevens, and admitted killing Zachary Snider. Ac-

cording to Mark, Christopher stated that on July 15 he was home in bed when Zachary rode over to his house, parked his bike in the garage, came inside, and awakened Chris. The two engaged in a sexual encounter, and when Zachary threatened to tell his parents, Christopher got scared and "clicked." (R. at 4258.) He told Mark that he attempted to kill Zachary by various means of strangulation, such as a "choke hold," smothering him with a pillow, and choking him with a cord, (R. at 4249–50), although there were parts of this episode which Christopher could not remember because he had a blackout of some sort. Christopher then told Mark that he backed his car into the garage, placed Christopher's body and bike into the back, and covered them. He then drove out into the country and threw the body and bike over a bridge. The bike got caught in a tree, so Stevens went down to rearrange things so as to conceal them. He later returned to recover a plastic bag which he had left with the body. During this admission, Christopher gave Mark detailed directions to the location of the bridge.

Mark went to the state police with this information on the morning of July 21. After speaking with Mark, state police detectives went in search of the bridge described in Mark's recitation of Christopher's confession. They "went to a location where [one detective] thought Mark Stevens was talking about, but it was the wrong one." (R. at 1309.) After a call to Mark Stevens they realized that they "went one direction and it was actually back the other way," (*id.*), so they back-tracked and found a second bridge eight to ten miles from the first. It was on a gravel road in a remote, rural area, with no home or structure within sight of it, surrounded by thick, overgrown vegetation. Under the bridge the police found a bicycle and the fully clothed, decomposing body of a boy.

Based on Mark Stevens' statement and its corroboration by what officers found under the remote bridge, the police obtained an arrest warrant and arrested Christopher Stevens at his home on the evening of July 21. They informed him of the charges against him and drove him to the state police post in

Putnamville. After being fully advised of his *Miranda* rights and signing a waiver of rights, Stevens submitted to an interview with the police.

In the videotaped confession which followed, Stevens told the officers that on Thursday, July 15, Zachary visited Stevens in the early afternoon, but stayed only for a short time, saying that he would return after he had picked up some money, talked to his father, and changed his clothes. When he returned, Zachary and Stevens talked for a while as Stevens flipped through the channels on his television, and then the two went to Stevens' bedroom and "messed around," which mainly included the two performing fellatio on each other but never anal sex. (R. at 1196–97, 1215.) This activity was not new to the pair, as they had had an ongoing sexual relationship since shortly after Stevens returned to Stardust Hills after serving his time in the Marion County jail. After they "did stuff for awhile," Zachary angrily confronted Stevens with a rumor he had heard concerning Stevens having sexual relations with Zachary's mother. Because of this rumor, Zachary threatened to reveal Zachary and Stevens' sexual relationship to his parents. This threat made Stevens "real scared." (R. at 1215.) He stated,

> [H]e said, he, he threatened to tell ... about me and him, and, uh, I'd just went through a bunch of shit in Indy, and that was just, just on my mind. I was like, I just didn't want to, thinking to myself, you know, I just can't go through all that shit again.

(Videotape: Interview of Christopher Stevens (July 21, 1993) (Sep. Bound R. of Proceedings, Ex. 15)).

After Zachary's threat, the two "messed around some more," which Stevens again stated meant "having sex." (R. at 1198.) Once finished, Stevens led Zachary by the hand into his brother's room and the two got onto the bed. Stevens took one of his brother's pillows and placed it over Zachary's face in an attempt to suffocate him. (R. at 1193,

1198.) Zachary did not really resist; rather, "he just kept sayin' 'I love you, Chris; I love you, Chris.'" (R. at 1198.) Because the pillow "wasn't doing anything," (R. at 1193), Stevens looked around the room and noticed a Sega Genesis controller on the floor. He picked it up and, using the cord, wrapped it around Zachary's neck, at first just once but then two or three times, and strangled the boy. When Stevens "thought it was all over," he removed the cord from Zachary's neck and proceeded to pace back and forth between Stevens' brother's bedroom and his own room looking at Zachary's body and contemplating what he would now do.

About five minutes later Zachary, while still unconscious, began to take deep breaths. So, Stevens said, "I went [into my kitchen] and got a trash bag and put it over his head and wrapped it around his head, he was unconscious so, you know, I knew he wouldn't be ripping it off his face and stuff." (R. at 1194.) Once the child had suffocated, Stevens carried Zachary from his brother's bedroom into his own room and laid the boy's body on his bed. Stevens later revealed to a psychologist for the defense that he killed for fear of having to return to prison brought on by Zachary's threat to tell.

Stevens then went out to the garage, pulled a trailer, lawn mower, and grill onto the driveway to make room for his car, brought his car into the garage, and shut the garage door. He then placed Zachary's bike [1] in the back of the car, went in and got Zachary's body and placed it also in the back of his car, and then covered them both with a cover. Stevens then described in detail how he drove out into the country and threw Zachary's body and bike over a bridge, naming the roads he took to reach the remote location. Initially, the bike got caught in a tree "where anybody could see it if they walked by or drove by," so Stevens "jumped down there" and pulled both Zachary's body and bicycle beneath the bridge. (R. at 1194.) In relating his state of mind during the murder and immediately thereafter, he described

---

1. Zachary's bike was already in the garage because, Stevens stated, "whenever he comes over I have him put his bike in the garage, when he comes over, so no nobody will see his bike there." (Videotape: Confession of Christopher Stevens, (July 21, 1993)) (Sep. Bound R. of Proceedings Exh. 15); (R. at 1193.)

himself as "nervous and scared," (R. at 1200), "all frantic," (R. at 1194), and "not really thinking" (*id.*).

Once home, Stevens telephoned Mark White to request help in pushing the trailer in his driveway back into his garage. After White assisted Stevens and left, Stevens placed the mower and grill back in the garage, and went back inside his house.

Later that evening, Stevens took a can of Lysol and sprayed down his car, the cover used in the car to conceal the body and bike, and his and his brother's beds. He also played basketball with White, during which time he saw the Sniders driving around the neighborhood looking for Zachary. When he and White finished playing basketball, Stevens called Mrs. Snider to learn the status of their search for Zachary, but did so under the guise of inquiring about some rock concert tickets. During this call, Mrs. Snider asked if Stevens had seen Zachary that day, to which Stevens said, "No." (R. at 1206) Mrs. Snider then revealed that Zachary was missing, and Stevens offered to help them look. Mrs. Snider replied that she would call him if they needed his help. Although she never called back, Stevens went over to their home just before 9 p.m. As he talked with Mrs. Snider, he saw a policeman arrive and walk up the Sniders' driveway. Because Stevens "didn't want to be around the cop," (R. at 1207), he told Mrs. Snider that he would "go check a couple of places" and quickly departed, (*id.*) Stevens then went to various houses asking the occupants if they had seen Zachary.

Later that night Stevens returned to Zachary's body because he recalled leaving the plastic trash bag wrapped around Zachary's head. Stevens stated, "I went back out there to get the trash bag 'cause, I figured if you guys [the police] seen the trash bag and looked in our house and seen the same kind of trash bags and, and stuff." (R. at 1194.) Stevens described the trash bag as one with handle ties, green outside and black inside. Upon recovering the bag, Stevens drove away from the scene and, after traveling some distance, threw the bag out of his window. Upon returning to Stardust Hills he again went to the Sniders' house and in-

quired whether they had heard anything yet, telling them he was up at that late hour because he was having trouble sleeping.

After the confession, the police searched for the trash bag mentioned by Stevens. They found one matching Stevens' description on the side of the road about a mile from where the body was located. While other bags observed during their search all contained trash, this one contained only road dust and debris, and appeared to have "at one time contained something that caused it to be stretched out," (R. at 3897). Later that same day, pursuant to a search warrant, police found similar trash bags and a Sega Genesis video game and controllers in Stevens' home.

The body found by police under the bridge was later identified through dental records as that of Zachary Snider. Also, Mr. Snider later identified the bike found with the body to be Zachary's. The pathologist who performed the autopsy, though unable to determine the cause of death because of the state of decomposition, observed no evidence inconsistent with death by either strangulation or suffocation. He found no broken bones and no evidence of any penetrating injury to the torso or lower extremities. When asked about the potential for a natural cause of death, the pathologist replied that the tissues of the heart, lungs, liver, and kidneys available for examination showed no signs of disease. The forensic entomologist who examined insect samples found in the body and in the soil under the bridge placed the time of death sometime between noon and sunset on July 15.

In August 1993, Stevens sent his stepmother a letter which said in part, "I'm sorry for killing someone in your house and causing you guys so much greif [sic]. I guess it is like everybody has always said. I guess I'm nothing but a worthless, perverted peice [sic] of trash." (R. at 4309, 4311.) Tracy Easton also received a letter from Stevens during this same time period, part of which stated, "You know your prediction was right. You said you thought I'd be right back in jail two months after I got out. Well, I was back in four days short of two months. I think you might have cursed me. HA! HA! I

don't really know what to say. Does it suprise [sic] you?" (R. at 4583.)

### I. Prosecutorial Conduct

■ Stevens makes several allegations of prosecutorial misconduct. To prove prosecutorial misconduct, an appellant must show both that the prosecutor's actions amounted to misconduct and that the misconduct, in light of all the circumstances, placed the defendant in a position of "grave peril" to which he should not have been subjected. *Maldonado v. State*, 265 Ind. 492, 355 N.E.2d 843 (1976). "Grave peril" is determined by analyzing "the probable persuasive effect of the misconduct on the jury's decision," *id.* at 499, 355 N.E.2d at 848, and whether there were "repeated instances [of misconduct which] evidence a deliberate attempt to improperly prejudice the defendant," *id.*, 355 N.E.2d at 848. Before we will analyze a claim of prosecutorial misconduct, however, the defendant must have made a timely objection to the alleged misconduct at trial to secure the issue for our review. *Id.* at 497–98, 355 N.E.2d at 848. Failure to so object waives the issue. *Id.*, 355 N.E.2d at 848.

■ Stevens makes several claims about prosecutorial misconduct during voir dire. One allegation arises from the prosecutor's display and reading of the entire death penalty statute, including its list of aggravating circumstances, to each panel of prospective jurors. The record discloses that this occurred as the prosecutor explained the different steps through which the statute requires a capital trial to go, and then asked the prospective jurors if they understood the process and had any questions or problems with it. (*See, e.g.,* R. at 1626–1633.) Stevens failed to object, however, thereby forfeiting appellate review of any alleged error arising from the prosecutor's actions.

■ In his reply brief, Stevens responds to the State's claim of waiver by inviting this Court to consider the prosecutor's actions under the "fundamental error" doctrine. Even if we were to consider improper the reading, displaying, and explaining the death penalty statute to prospective jurors during voir dire, such actions could not be said to so prejudice the rights of a defendant as to make a fair trial impossible, *see, e.g., Tobias v. State*, 666 N.E.2d 68 (Ind.1996); *Townsend v. State*, 632 N.E.2d 727 (Ind.1994). This is particularly true in Stevens' case, where the court informed the jury several times of the State's burden to prove the existence of at least one of the *charged* aggravating circumstances beyond a reasonable doubt, (R. at 5455–56, 5458–61), and the specific findings in the jury's recommendation indicate that only the charged aggravating factors were considered in the balancing process, (*see* R. at 987–88).[2]

---

2. The common law doctrine of "fundamental error" was originally adopted to permit appellate courts a means by which they could correct the most egregious and blatant trial errors that otherwise would have been procedurally barred on direct appeal. Although intended for application in only the most exceptional of instances, appellants now flippantly claim as "fundamental" any and all alleged errors unpreserved by contemporaneous objection, regardless of the true weight of their claims, effectively causing the exception to swallow the rule. In 1985 we noted that "if the fundamental error doctrine is to continue to have any meaning it cannot become a ruse to circumvent the necessity of timely objecting to alleged error during the trial." *Cox v. State*, 475 N.E.2d 664, 670 (Ind.1985). Continued attempts at such circumvention have led this Court, twelve years later, to propose Criminal Rule 8.5(b), which would abolish the doctrine of fundamental error in all but a few narrow instances. *See generally* Comments Sought on Proposed Amendments, *Res Gestae*, July 1997, at 8–9. "Fundamental error" should be a rare, rather than

merely an alternative, claim. As Justice Arterburn wrote nearly forty years ago,

> It is a fundamental principle that a party may not sit by during trial and make no objection or complaint, await the outcome of the trial, and if unfavorable, then claim error which could have at the time been promptly called to the attention of the trial court. A trial court should be given the opportunity to correct its own mistakes before asking a review from a court of appeals.

*Brown v. State*, 239 Ind. 184, 188, 154 N.E.2d 720, 721 (1958). As we have more recently stated in *Canaan v. State*, 683 N.E.2d 227 (Ind. 1997),

> It is true that we have acknowledged an exception to the waiver rule in circumstances where the trial court committed "fundamental error." But we view this exception as an extremely narrow one, available only "when the record reveals clearly blatant violations of basic and elementary principles [of due process], and the harm or potential for harm [can]not be denied."

Stevens also alleges that the prosecutor committed misconduct during voir dire by commenting on the existence of inadmissible evidence. After the prosecutor's discussion of aggravating circumstances with the third panel[3] of prospective jurors, he explained that because of *Bivins v. State*, 642 N.E.2d 928 (Ind.1994), *cert. denied,* 516 U.S. 1077, 116 S.Ct. 783, 133 L.Ed.2d 734 (1996), the State could only present evidence relevant to the statutorily prescribed aggravators, and thus any evidence of "victim impact" not relevant to those factors would not be introduced.[4] In response to Stevens' objection, the court admonished the prospective jurors to consider only the evidence presented by the parties, not to speculate on the existence or nonexistence of evidence not presented by the parties, and to disregard the prosecutor's remarks regarding victim impact evidence.

■ Regardless of whether the prosecution's comment on *Bivins* was improper, it could not be said to have placed Stevens in a position of "grave peril," as its probable persuasive effect on the jury's verdict and/or sentence is nil. First, the comment was innocuous, and the admonishment was more than adequate to cure any minute prejudice the comment could possibly have caused. Second, regardless of what was said by the parties, no reasonable juror could have sat through this trial without feeling great empathy for Zachary's parents, wondering how he or she would feel if his or her own ten-year-old child were sexually molested by a neighbor, brutally suffocated and strangled, and then dumped over a remote bridge to decompose beyond recognition. The prosecutor's

brief, general statement in voir dire regarding *Bivins* and victim impact testimony would not have appreciably contributed to such thoughts by the jurors. In fact, as the State points out, Stevens' *own* counsel's comments were much more likely to stir juror empathy towards the Sniders. In his opening statement on sentencing, Stevens's lawyer said,

> The past three or four days have been about. . . . the tragic and horrible death of Zachary Snider. And I don't mean to in any way in whatever I say or do here to depreciate from that. The Sniders have suffered the most horrible loss you can imagine, the loss of a son. I feel for them. I know you do. We've seen it. Most, if not all, of you have children. There's no greater loss.

(R. at 4450.) We are satisfied the prosecutor's comment on *Bivins* during voir dire did not affect the outcome of Stevens' trial.

■ Stevens also alleges prosecutorial misconduct surrounding Exhibit 15, the post-arrest videotape of Stevens's confession. The tape had been redacted, pursuant to an order in limine, to remove statements referring to Stevens' previous criminal history. The prosecutor, when laying the foundation for the admission of the redacted videotape, asked the witness, "Now, this State's Exhibit 15 which we've identified as a videotape, does it, with the exceptions of certain items that were ruled inadmissible—." (R. at 3937.) Stevens immediately objected and requested a mistrial, claiming the prosecutor had violated the order in limine. (R. at 3938–39.) The

*Id.* at 235 n. 6 (quoting *Warriner v. State,* 435 N.E.2d 562, 563 (Ind.1982)).

**3.** The prosecutor made similar comments to the first two panels of prospective jurors. Because Stevens did not make timely objections to the first two statements of this kind, however, he forfeited review of any alleged error arising therefrom. *Mftari v. State,* 537 N.E.2d 469 (Ind. 1989).

**4.** After reading Indiana Code § 35–50–2–9(b) to the prospective jurors, the prosecutor stated,

> The State has to prove beyond a reasonable doubt—to get that the State has to prove at least one of those aggravating circumstances.
> Has everybody had a chance to read it? Any questions?

> This is the time to ask if you have any questions. Okay.
> Part C talks about—there is something else I wanted to mention with this. At the phase of sentencing, the State can only present evidence that goes directly to one of these points.
> I know that some of you follow—maybe you hear about victim impact statement [sic], what it does to family, all this other stuff. In any criminal case where murder is charged and the State is asking for the death penalty, under a recent case that came out in the last three months, *Bivins v. State,* the State may not go into anything else other than what's listed in this statute at the sentencing hearing, so don't expect—
> (R. at 2170–71.)

prosecutor explained to the court that the witness was going to be asked if the tape was a true and accurate recording of Stevens' confession and that he thought the witness would commit perjury if he said, "yes," if in fact the tape had been modified through redaction. (R. at 3940, 3945–46, 3950.) Although the court overruled Stevens' motion for mistrial, it struck the prosecutor's question from the record, admonished the jury to disregard it, and reminded the jury that it was not to concern itself or discuss the reasons for the admissibility or nonadmissibility of evidence.

While the prosecutor's question may have been phrased differently so as to avoid informing the jury that the redacted portions of the tape had been ruled inadmissible, we do not believe the phrase at issue to be a deliberate prosecutorial attempt to prejudice the defendant, *cf. McDonald v. State,* 542 N.E.2d 552 (Ind.1989) (finding denial of mistrial appropriate where there was no basis for finding prosecutorial statement to be a "deliberate evidentiary harpoon"), and thus did not rise to the level of "misconduct."

■ After this incident concerning the prosecutor's question, the court admitted the videotape and played it for the jury. This version of the videotape contained Stevens stating, "I remember thinking no, I'm not going—I'm not going to go through this again," which had previously been redacted pursuant to the court's order in limine. Stevens objected and moved for mistrial. The prosecutor explained he was surprised by the inclusion and that the error must have inadvertently occurred when his investigator attempted to make a second redacted version of the videotape to replace the first which had proved inaudible. After reviewing the tape to see the unredacted statement, the court reversed its prior ruling in limine regarding this particular statement and allowed it to stand, finding it evidence of motive under Rule 404(b), and that its probative value outweighed any negligible prejudicial

effect, given that no other evidence of Stevens's past conviction had come into evidence. The court did, however, direct the prosecutor not to refer to the statement in future examination or argument.

Stevens alleges that this is just another example of the State's attempt to prejudice him through misconduct. We disagree. The trial judge found the sentence to have been "mistakenly included," (R. at 4002), and found any prejudice to Stevens to be harmless. The trial court correctly denied Stevens' motion for mistrial.

■ Stevens claims that prosecutorial statements during the State's guilt and penalty phase closing arguments amounted to misconduct. He did not object at trial to the statements he now claims were improper, and thus did not preserve these claims.

Finally, Stevens, citing *Foster v. State,* 436 N.E.2d 783 (Ind.1982), and *Hossman v. State,* 473 N.E.2d 1059 (Ind.Ct.App.1985), claims that the forgoing prosecutorial actions established an improper theme began in voir dire and carried throughout the trial, evincing a deliberate attempt sew "seeds of prejudice ... so that they could 'sprout in the privacy of the jury room when the jurors considered the evidence to arrive at their verdict.'" (Appellant's Br. at 30, quoting *Foster,* 436 N.E.2d at 786.) Notwithstanding these hyperbolic allegations, nothing in this case even remotely resembles the prejudice in *Foster* or *Hossman.* Stevens is not entitled to relief under his claims of prosecutorial misconduct.

## II. Rule 404(b) Claim

■ Stevens argues that the trial court erred by allowing the State to admit testimony regarding Stevens' contact with Zachary during the two months before the murder. He points to testimony showing that Stevens had attended a Bible study class held in the yard of Alex Krouse which Alex had also attended,[5] that Stevens had attended and videotaped one of Zachary's Little League

---

5. The State had expected to elicit from Krouse that Zachary had attended the class and then that Stevens had videotaped the class. (R. at 4109.) Because Krouse testified that he could not remember if Zachary had attended the class, the State stopped questioning Krouse regarding

it and withdrew the previous question, (R. at 4110), which had been, "And, what, if anything, did Christopher do at the class?" (R. at 4109.) Stevens's only objection to this question at this time regarded its relevance. (R. at 4108, 4110.)

baseball games at which he offered five dollars to any boy who hit a home run,[6] and that Stevens had taken Zachary fishing. Stevens claims this testimony was inadmissible under Indiana Rule of Evidence 404(b).

The Indiana Rules of Evidence provide that all relevant evidence is generally admissible. Ind. Evidence Rule 402. "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. The State's theory of the case was that Stevens killed Zachary to prevent him from disclosing Stevens's sexual molestations of Zachary. (R. at 4140.) Thus, the circumstantial evidence at issue was relevant in that it allowed the jury to infer an ongoing relationship between the two, which corroborated the testimony of Mark Stevens and appellant's confession regarding motive.

Stevens' argument that Rule 404(b) proscribes admission of this testimony is misdirected, for Rule 404(b)[7] does not apply to this evidence. Commonly known as a rule addressing "uncharged misconduct," *see Hardin v. State,* 611 N.E.2d 123, 128 (Ind. 1993), or "prior bad acts," *see Johnson v. State,* 655 N.E.2d 502, 504 (Ind.1995), Rule 404(b) has normally applied to evidence of a defendant's extrinsic activity which reflects adversely on his character. *United States v. Roe,* 670 F.2d 956, 966 (11th Cir.1982). Videotaping a baseball game, attending a neighborhood Bible study, and taking a child fishing are not extrinsic activities which would, by themselves, indicate any unsavory character trait with which Stevens' could have acted in conformity on the day of Zachary's

murder. Only after corroborating the direct evidence of motive contained in both Mark Stevens' testimony and the appellant's own confession does the challenged evidence take on a darker inference.

Because this evidence does not fall within the ambit of 404(b), its admissibility is left to the balancing test of Rule 403.[8] We conclude that this evidence tends to corroborate the testimony of Mark Stevens and appellant's own confession, and that any unfair prejudice that might accrue from it is slight.

### III. Admissibility of Confession

The Indiana State Police arrested Stevens in his driveway at about 7 p.m. on July 21, 1993, pursuant to an arrest warrant issued by the Putnam Circuit Court. Stevens claims that his arrest was illegal because the affidavit submitted to Judge Pro Tempore Sally Gray by the police was insufficient to establish probable cause. He argues that his confession was thus inadmissible as the product of an improper arrest.

 In felony cases, arrest warrants are only required when physical entry of a home is necessary to effect the arrest. *New York v. Harris,* 495 U.S. 14, 17–18, 110 S.Ct. 1640, 1642–43, 109 L.Ed.2d 13 (1990). As *Harris* plainly states, warrantless arrests outside the home are permissible so long as the arresting officer has probable cause to believe the defendant committed a felony. *Id.* The warrant line is drawn at the entrance of the home because " ' "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." ' " *Id.* at 18, 110 S.Ct. at 1643 (quoting *Payton v. New York,* 445 U.S. 573, 585, 100 S.Ct. 1371, 1379–80, 63 L.Ed.2d 639

---

**6.** Stevens' brief also refers to testimony given by Lori Rumley, the mother of Alex Krouse, regarding the baseball game. (Appellant's Br. at 44.) He provides neither quotes of her allegedly objectionable testimony nor citation to where such testimony might be found in the record, however. Ind.Appellate Rule 8.3(A)(7). Accordingly, we will only review the testimony to which Stevens properly draws our attention.

**7.** Rule 404(b) states,

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity

therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, . . . .

Ind.Evidence Rule 404(b).

**8.** Rule 403 states,

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

Evid.R. 403.

(1980) (quoting *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134–35, 32 L.Ed.2d 752 (1972))). Because the state police arrested Stevens in his driveway,[9] we need only address whether the officers had probable cause to arrest Stevens on July 21, 1993, and need not address the alleged infirmities in the issuance of the arrest warrant.

■ Probable cause to arrest exists when either a particular law enforcement officer or the organization of which he is a part has knowledge of circumstances and facts that would cause a person of reasonable caution and prudence to believe that the defendant has committed a particular crime. *Duncanson v. State,* 509 N.E.2d 182 (Ind. 1987). "When law enforcement officers rely on a tip received from a third source, probable cause may be established by verification of extensive facts which sufficiently demonstrate the reliability of the tip." *Id.* at 185.

Mark Stevens, the appellant's own brother, went to the State Police on the morning of July 21 and informed them that the appellant came to his house on July 19, confessed in detail to killing Zachary Snider, and particularly described where he had concealed the body. The state police corroborated Mark Stevens' statement by finding a bicycle and the decomposing body of a boy under the remote, overgrown bridge described by Mark Stevens' directions. While they could not positively identify the body at that time due to the advanced state of decay, the investigating detective on the scene believed its appearance to be consistent with how the body of a ten-year-old Caucasian boy would look six days after death. Also, the bike matched a description the detective had previously received, as well as did the khaki pants found on the body.

These extensive facts would be adequate to cause a reasonably cautious and prudent person to believe Mark Stevens' statement true, and thus to believe Christopher Stevens guilty of the crime. However, the state police had even more (such as Stevens' lies to the police four days earlier). The totality of the circumstances more than establish probable cause to arrest Christopher Stevens for the murder of Zachary Snider. Therefore, Stevens' confession was not the product of an unlawful arrest.

■ Stevens also claims that his post-arrest confession was made involuntarily. The state police advised Stevens of his *Miranda* rights, and his right to cease answering questions at any time, before they began the interview. Stevens then signed a waiver of rights form. Moreover, Stevens indicated before the interview began that he had no reservations about talking to the detectives, and he confirmed that he was agreeing to speak to them without a lawyer present and that he understood his rights. Finally, review of the videotape clearly indicates no elements of coercion. The entire interview lasted about an hour. Instead of showing overbearing officers soliciting short, "yes/no" responses from a broken, harassed, tired suspect, the tape shows non-threatening police officers asking general questions of Stevens, and then an alert, responsive Stevens supplying long, detailed narrative. (Videotape: Confession of Christopher Stevens (July 21, 1993) (Sep. Bound R. of Proceedings Exh. 15).) The trial court properly admitted Stevens' confession.

### IV. Corpus Delicti

■ Stevens claims the trial court erred in admitting his confession because insufficient evidence of corpus delicti existed to support it. "In Indiana, to support the introduction of a defendant's confession into evidence, the corpus delicti of the crime must be established by independent evidence of 1) the

---

9. Some might maintain that one's driveway is within the curtilage of one's home and thus within the ambit of Fourth Amendment protection, but *Harris* appears to preempt such an argument:

> For Fourth Amendment purposes, the legal issue is the same as it would be had the police arrested Harris *on his doorstep,* illegally entered his home to search for evidence, and later interrogated Harris at the station house. Similarly, if the police had made a warrantless entry into Harris' home, not found him there, but arrested him on the street when he returned, a later statement made by him after proper warnings would no doubt be admissible.

*Harris,* 495 U.S. at 18, 110 S.Ct. at 1643 (emphasis added).

occurrence of the specific kind of injury and 2) someone's criminal act as the cause of the injury." *Willoughby v. State*, 552 N.E.2d 462, 466 (Ind.1990). As we stated recently in *Johnson v. State*, 653 N.E.2d 478, 480 (Ind. 1995), the independent evidence need not be shown beyond a reasonable doubt; rather, the evidence need only provide an *inference* that a crime was committed.

The positively identified body of Zachary Snider was found *underneath*, and not beside, a remote, small bridge in rural Putnam County. The bridge's sides were overgrown with tall, thick vegetation, and the small, shallow stream which ran underneath it was only a few feet wide. There appears to be no real possibility that Zachary rode his bike to this remote location and fell, with his bike, over the guardrail to wind up directly underneath the bridge. Rather, if he had fallen over, he would have landed in the overgrown vegetation on either side of the bridge, and the stream was not deep enough and the current not strong enough to have carried him and his bicycle underneath it.

Furthermore, while the pathologist who performed the autopsy on Zachary's body could not determine the exact cause of death due to the degree of decomposition, he examined the skull, neck and rest of the body and found no broken bones and no penetrating injury to the chest, abdomen, or lower extremities, injuries which would likely accompany a fatal fall from a bridge. While there may be plausible non-homicidal explanations for why Zachary's body and bike were found where they were, "[t]he independent evidence supporting the corpus delicti need not preclude every possible explanation of the circumstances." *Johnson*, 653 N.E.2d at 480 n. 4. While "[a] dead body alone is not proof of the corpus delicti in a homicide case; ... an identified dead body with ... surrounding circumstances that would indicate the deceased did not die from natural causes establishes prima facie that a homicide has been

committed and the corpus delicti." *Brown v. State*, 239 Ind. 184, 190, 154 N.E.2d 720, 722 (1958), *cert. denied*, 361 U.S. 936, 80 S.Ct. 375, 4 L.Ed.2d 360 (1960).[10] The surrounding circumstances in this case provide a sufficient inference of criminal agency to satisfy the corpus delicti rule.

One of the aggravating circumstances found to justify Stevens' death sentence was that he murdered Zachary Snider while committing child molesting. Ind.Code Ann. § 35–50–2–9(b)(1)(C) (West Supp.1997). (R. at 5480, 5642–43.) Stevens argues his death sentence must be reversed because there was no independent evidence of child molestation besides that found in his confession.

■■■ We addressed an analogous claim in *Willoughby v. State*, 552 N.E.2d 462 (Ind. 1990), where an appellant convicted of murder, felony-murder, robbery, and confinement argued that his confession, which implicated him on all four counts, should not have been admitted because corpus delicti had not been established for each of the crimes. *Id.* at 465–66. After reviewing the genesis of the corpus delicti rule, the justifications underlying it, and its present declining utility, *id.* at 466–67,[11] we concluded that

> where a defendant confesses to several crimes of varying severity within a single criminal episode, strict and separate application of the corpus delicti rule to each offense adds little to the ultimate reliability of the confession once independent evidence of the principal crimes is introduced. The confession at that point has been substantially corroborated. In such a case the confession stands as direct evidence of each crime, even those not separately corroborated, if the independent evidence establishes the corpus delicti of the principal crime or crimes.

*Id.* at 467.

■■■ We believe this reasoning logically extends to death penalty aggravators alleged

---

**10.** The facts of Stevens' case are very similar to those in *Brown*. There, we found corpus delicti established by a positively identified corpse found "decomposed and under a pile of stone and trash, obviously concealed by some person," *id.* at 193, 154 N.E.2d at 723. As in *Brown*, "[a]ny reasonable person would come to the conclusion that [the victim] had been killed or mur-

dered by some one who had concealed the body." *Id.* at 193, 154 N.E.2d at 723.

**11.** *See also* Diane M. Moore, *Indiana's Corpus Delicti Rule: Time for a Change*, Res Gestae, Aug. 1997, at 24–30.

to have occurred as part of the same criminal episode. *Accord State v. Lee,* 335 N.C. 244, 439 S.E.2d 547 (1994); *State v. Bishop,* 753 P.2d 439 (Utah 1988). An inference of murder exists from the independent circumstances of this case. As such, separate application of the corpus delicti rule to the child molestation aggravating factor would "add[ ] little to the ultimate reliability of the confession." *Willoughby,* 552 N.E.2d at 467. Stevens' confession was fully admissible as direct evidence of the child molestation aggravating factor.

## V. Voluntary Manslaughter Instruction

■■■■ Stevens claims the court erred in refusing his tendered voluntary manslaughter instruction. In *Wright v. State,* 658 N.E.2d 563 (Ind.1995), we set forth a three-step analysis for determining when a court should give a lesser included offense instruction. First, the court must determine whether the lesser included offense is *inherently included* in the crime charged. If not, then it must determine whether the lesser included offense is *factually included* in the crime charged. If either of the first two steps are satisfied, then the court must determine whether a *serious evidentiary dispute* exists whereby the fact-finder could conclude that the defendant committed the lesser, but not the greater, offense. If the court reaches the third step and answers affirmatively, it should give the requested instruction. *Id.* at 566–67. Any appreciable evidence of sudden heat justifies an instruction on voluntary manslaughter. *Roark v. State,* 573 N.E.2d 881, 882 (Ind.1991) (citing cases).

As for *Wright*'s first step, we recently analyzed our murder [12] and voluntary manslaughter [13] statutes and concluded that the latter is inherently included within the former. *Horan v. State,* 682 N.E.2d 502, 506–07 (Ind.1997). Therefore, we proceed to consider whether a serious evidentiary dispute existed regarding Stevens acting under "sudden heat."

"Sudden heat" occurs when a defendant is provoked in a way sufficient to "excite in [his] mind ... such emotions as either anger, rage, sudden resentment, or terror as may be sufficient to obscure the reason of an ordinary man, and to prevent deliberation, premeditation, to exclude malice, and to render the defendant incapable of cool reflection." *Dickens v. State,* 260 Ind. 284, 293, 295 N.E.2d 613, 618 (1973); *see also Clark v. State,* 668 N.E.2d 1206, 1209 (Ind.1996). Appellant points to parts of Mark Stevens' testimony and parts of his own confession which indicate that he killed Zachary out of fear created when Zachary threatened to expose Stevens' sexual molestations of the boy. According to Mark Stevens, the appellant told him that when Zachary threatened to tell, he just "clicked," or "went off," such that he could not remember some of the specifics of the murder. (R. at 4258.) Stevens' own confession also indicated Zachary's threat made him "real scared." (R. at 1215.) This evidence, Stevens argues, warranted an instruction on whether "sudden heat" caused him to kill Zachary.

■■■■ We disagree with Stevens' argument for several reasons. First, we have stated many times that "words alone cannot constitute sufficient provocation to give rise to a finding of sudden heat warranting an instruction on voluntary manslaughter." *Matheney v. State,* 583 N.E.2d 1202, 1205 (Ind.1992) (citing *Perigo v. State,* 541 N.E.2d 936 (Ind. 1989)). This is especially so where the "words" at issue are not intentionally designed to provoke the defendant, such as "fighting words," *Perigo,* 541 N.E.2d at 941 (Dickson, J., concurring and dissenting), but rather amount to a threat to "tell on" the defendant for his acts of child molestation.

Second, the standard turns on provocation "sufficient to obscure the reason of an ordinary man." *Dickens,* 260 Ind. at 293, 295 N.E.2d at 618. Thus, the relevant question is not whether Stevens was actually afraid of having his sexual molestation activity revealed by Zachary, but rather whether a ten-year-old boy's threat of "I'm telling my mom on you" would understandably provoke an ordinary twenty-year-old man to explosive rage or terror. We think not.

---

12. Ind.Code Ann. § 35–42–1–1 (West Supp. 1997).

13. Ind.Code Ann. § 35–42–1–3(a) (West Supp. 1997).

■ Third, the facts indicate that there was nothing "sudden" about Stevens' decision to kill Zachary. When Zachary "threatened" Stevens, rather than erupting in blind rage Stevens engaged the boy in further acts of sexual molestation. Only after he was finished did Stevens then lead the boy by the hand into a different room to set about killing him. Also, Stevens had told his former cellmate that he would kill his next victim rather than allow him to tell so as not to be convicted, again, of child molesting. (R. at 4587–88.) Stevens clearly contemplated this course of action before it occurred, and his "fear" did not obscure his ability to obtain further perverse gratification before coolly leading his victim to another room to kill him. Clearly, the impetus to kill did not just suddenly overwhelm Stevens.

■ Fourth, even if a boy's threat to expose his child molester could sufficiently engender "sudden heat," a sufficient "cooling off" period occurred here so as to negate any "sudden fear" that might have overwhelmed Stevens. Stevens attempted to smother the boy while the boy cried out, "I love you, Chris. I love you, Chris." Then, when that was not working, Stevens strangled Zachary with a cord until the boy appeared dead. Five minutes later, after Stevens had removed the cord and himself from Zachary and paced back and forth contemplating how he would dispose of the body, Zachary again began to breath. This was ample time for Stevens to collect his wits and realize the heinousness and depravity of his actions. Instead, at that point when Zachary's unconscious body again began to fight for life, Stevens coolly and deliberately devised and carried out yet a third way of attempting to silence the boy permanently—by going to his kitchen, finding a trash bag, and smothering the helpless boy with it.

This murder was premeditated, deliberate, and drawn-out. Nothing in these facts bespeaks a "serious evidentiary dispute" as to whether Stevens did anything other than intentionally, knowingly, and mercilessly murder Zachary Snider.

## VI. Constitutionality of Death Penalty Statute

Although acknowledging that we have previously decided to his detriment many of the arguments he advances, Stevens makes numerous challenges to Indiana's death penalty statute "to preserve them should this [C]ourt reverse its earlier holdings and for federal review." (Appellant's Br. at 70.) For those claims previously addressed by this Court adversely to Stevens,[14] as Justice DeBruler said, "The court does not choose to reassess its position at this time." *Daniels v. State,* 528 N.E.2d 775, 783 (Ind.1988).

Citing *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), but

---

14. *Harrison v. State,* 644 N.E.2d 1243, 1258 (Ind. 1995) (prosecutorial discretion in seeking death penalty not unconstitutional); *Fleenor v. State,* 514 N.E.2d 80, 90 (Ind.1987), *cert. denied,* 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988) (death penalty does not violate Art. I, § 18, of the Indiana Constitution); *Lowery v. State,* 640 N.E.2d 1031, 1043–44 (Ind.1994) (jury as recommender rather than as sentencer does not violate *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)); *Peterson v. State,* 674 N.E.2d 528, 541 (Ind.1996) (judicial override provision of death penalty statute does not deprive capital defendant of right to trial by jury); *Miller v. State,* 623 N.E.2d 403, 410 (Ind.1993) (statute does not require sentencer to consider irrelevant enumerated mitigating factors, nor does it ascribe too little weight to non-enumerated mitigating factors); *Bivins v. State,* 642 N.E.2d 928, 947 (Ind.1994) (qualifying language in enumerated death penalty mitigators does not preclude or restrict consideration of relevant mitigating circumstances under the "catch-all" mitigator); *see also Blystone v. Pennsylvania,* 494 U.S. 299, 304–05, 110 S.Ct. 1078, 1082–83, 108 L.Ed.2d 255 (1990) (finding statutory scheme having enumerated aggravators with qualifying language, combined with "catch-all" mitigator, did not prevent jury from considering all relevant mitigating evidence); *Bivins,* 642 N.E.2d at 945–46 (statute does not impermissibly shift burden of proving whether aggravation outweighs mitigation to defendant); *Moore v. State,* 479 N.E.2d 1264, 1281 (Ind.), *cert. denied,* 474 U.S. 1026, 106 S.Ct. 583, 88 L.Ed.2d 565 (1985) (statute not unconstitutional because it does not state that aggravators must be found to outweigh mitigators beyond reasonable doubt); *Woods v. State,* 547 N.E.2d 772, 794 (Ind.1989) (incorporation of guilt phase evidence into penalty phase does not present risk of jury considering non-statutory aggravating circumstances as part of sentencing determination when trial judge properly instructs jury that it can only consider statutory aggravators); *Miller,* 623 N.E.2d at 411 (statute not unconstitutional because it allows State to present the final closing argument in the penalty phase).

without reference to any specific pages, Stevens claims that capital juries are more "conviction-prone" than non-capital juries; therefore, due process requires a prosecutor to submit the issue of capital qualification to a neutral fact-finder before proceeding to select a "death-qualified" jury. Not only does *Lockhart* fail to support this premise,[15] but it also refers to "death-qualified" juries as "impartial," *see id.* at 175–76, 180, 106 S.Ct. at 1765–67, 1768–69, when reaching its conclusion that "death-qualification" of juries is constitutionally permissible. We fail to see how submission of a case to an impartial jury could offend notions of due process.

■ Stevens claims the death penalty statute is unconstitutional because it does not specifically require the sentencer to ascribe some degree of weight to every piece of mitigating evidence offered by a capital defendant. While the statute does not specifically so state, it does require a sentencer, before imposing the death sentence, to find specifically that "any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances." Ind.Code Ann. § 35–50–2–9(k)(2) (West Supp.1997). By necessity, therefore, the sentencer must ascribe some weight to the mitigating circumstances which actually exist in order to perform such a balance. A sentencer need not, however, ascribe the same weight to the mitigating evidence that the defendant does, nor must it give any weight to evidence which it believes irrelevant or false. *Widener v. State,* 659 N.E.2d 529, 533–34 (Ind.1995) (stating that the sentencing court "is not obligated to find that mitigating circumstances exist at all," if in fact they do not).[16]

## VII. Life Without Parole Amendment

Since the late 1970's Indiana has employed a death penalty scheme which permits a jury to recommend and a judge to impose a death sentence only when the State has proven beyond a reasonable doubt the existence of one or more enumerated aggravating circumstances and that those aggravating circumstance(s) outweigh any mitigating circumstances. Ind.Code Ann. § 35–50–2–9 (West 1978 & Supp.1997). In 1981, we held that this scheme complies with U.S. Supreme Court Eighth Amendment jurisprudence which required that a sentencer's discretion be sufficiently channeled and the sentence reviewed so as to prevent "arbitrary and capricious" imposition of the death penalty. *Judy v. State,* 275 Ind. 145, 416 N.E.2d 95, 105–08 (1981) (citing *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)).

In 1993 and 1994 the legislature amended the statute to allow a choice between death

15. Stevens' brief states, "In *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 ... (1986), the United States Supreme Court recognized the validity of studies establishing 'that "death qualification" in fact produces juries somewhat more "conviction-prone" than "non-death qualified" juries.' *Id.*" Counsel then builds two claims against Indiana's statute upon this premise. (Appellant's Br. at 71–72 (quoting *Lockhart,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137).) An honest approach would have supplied the full quote from *Lockhart:*

 Having identified some of the more serious problems with McCree's studies [regarding "death-qualified" juries being "conviction-prone"], however, we will assume for purposes of this opinion that the studies are both methodologically valid and adequate to establish that "death qualification" in fact produces juries somewhat more "conviction prone" than "non-death-qualified" juries. We hold, nonetheless, that the Constitution does not prohibit the States from "death qualifying" juries in capital cases.

*Lockhart,* 476 U.S. at 173, 106 S.Ct. at 1764–65. Not only did the Supreme Court *not* recognize the validity of these studies (the quote clearly shows the Court merely saying that even if the studies were valid, their validity would not change the outcome of the case before it), but the *four U.S. reporter pages* preceding this quote contain *detailed criticism* of the fifteen social science studies introduced by McCree showing their *insufficiency* at proving that "death-qualified" juries are more "conviction-prone." *See id.* at 168–173, 106 S.Ct. at 1762–65. We do read the cases cited in appellate briefs and have low regard for patently false assertions regarding the precedent from which they are lifted. Ind.Professional Conduct Rule 3.3(a)(1) ("A lawyer shall not knowingly ... make a false statement of ... law to a tribunal....").

16. Alternatively, one might say that by determining such evidence to be false, a sentencer *has* ascribed a weight to such evidence, a weight of "zero."

and life imprisonment without the possibility of parole. Pub.L. No. 158, § 7, 1994 Ind. Acts 1854; Pub.L. No. 250, § 2, 1993 Ind. Acts 4478, 4481 (now codified at Ind.Code Ann. § 35–50–2–9 (West Supp.1997)). The amended statute provides no instruction for distinguishing between the possible sentences once the jury and/or judge have found the aggravators to outweigh the mitigators. Thus, the court in this case did not instruct Stevens' jury concerning what factors should influence its sentencing determination if it should find the aggravators to outweigh the mitigators. Stevens claims that because the statute, on its face and as applied, does not specify a standard for choosing one sentence or the other, the jury's and judge's discretions are not adequately guided, thus violating the Eighth Amendment.[17]

In *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the Court said:

> A fair statement of the consensus expressed by the Court in *Furman* is that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."

*Id.* at 874, 103 S.Ct. at 2741 (quoting *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932–33, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). The respondent in that case argued that this mandate in *Furman* was "violated by a scheme that permits the jury to exercise unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty by statute." *Id.* at 875, 103 S.Ct. at 2741–42. The Court

dismissed this argument, however, because it "could not be accepted without overruling [the] specific holding in *Gregg*." *Id.* The Court stated:

> The approval of Georgia's capital sentencing procedure rested primarily on two features of the scheme: that the jury was required to find at least one valid statutory aggravating circumstance and to identify it in writing, and that the State Supreme Court reviewed the record of every death penalty proceeding to determine whether the sentence was arbitrary or disproportionate. These elements, the opinion concluded, adequately protected against the wanton and freakish imposition of the death penalty.

*Id.* at 876, 103 S.Ct. at 2742.

▋ Similarly, allowing an Indiana trial judge, once the class of death-eligible murderers is narrowed through the balancing of aggravating and mitigating circumstances, the authority to decide with a jury's advice between life without parole and death is not constitutionally impermissible. Assessing slightly different arguments, we reach the same conclusion today in *Wrinkles v. State*, 690 N.E.2d 1156 (Ind.1997). This Court still automatically reviews the appropriateness of all death sentences. Ind. Const. art. VII, § 4. Moreover, our system, even with its life without parole amendment, still "rationally distinguish[es] between those individuals for whom death is an appropriate sanction and those for whom it is not," *Spaziano v. Florida*, 468 U.S. 447, 460, 104 S.Ct. 3154, 3162, 82 L.Ed.2d 340 (1984), by using aggravating circumstances which "limit the class of offenders upon which the sentencer is authorized to impose the death penalty," *Sawyer v. Whitley*, 505 U.S. 333, 341–42, 112 S.Ct. 2514, 2520, 120 L.Ed.2d 269 (1992). In order to arrive at a sentence of life without parole, the

---

**17.** Stevens also cites article one, sections thirteen, sixteen, eighteen, and twenty-three, of the Indiana Constitution in support of his claim. Because he provides no separate legal analysis under sections thirteen, eighteen, and twenty-three beyond their mere citation, however, Stevens waives any claims he might have thereunder. *Bivins v. State*, 642 N.E.2d 928, 936 n. 1 (Ind.1994), *cert. denied*, 516 U.S. 1077, 116 S.Ct. 783, 133 L.Ed.2d 734 (1996). Similarly, the only other mention of section sixteen beyond its initial citation comes in reference to the statement, "In a capital case, state constitutional guarantees provide more extensive protection than that guaranteed by the 8th Amendment." (Appellant's Br. at 81–82.) Such a general proposition, without more, does not qualify as "cogent argument" sufficient to preserve a section sixteen claim. Accordingly, we will review this issue under the authority from which Stevens does cogently argue, namely the Eighth Amendment.

jury and court must find the existence beyond a reasonable doubt of at least one of the same statutorily prescribed aggravating circumstances as they must find for a sentence of death, and likewise must find the aggravating circumstance(s) outweigh the mitigating circumstances.[18]

Thus, by definition, those who receive a sentence of life without parole are within the class of those eligible for death (i.e., for whom death would be "appropriate"), even if they receive a sentence different than death. It is this narrowing and channelling of the class of murderers which significantly reduces the risk that sentencing of murderers will be "wholly arbitrary and capricious," *Gregg,* 428 U.S. at 189, 96 S.Ct. at 2932. As the Court stated in *Lowenfield,* "[t]he use of 'aggravating circumstances' is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channelling the jury's discretion." 484 U.S. at 244, 108 S.Ct. at 554.

Juries and courts could have many different reasons for choosing to sentence a death-eligible defendant to life without parole instead of death. One reason, of course, could be leniency. They could decide that because the aggravating circumstances outweigh the mitigating circumstances the murderer deserves something more than a term of years, but also find some aspect of his case that makes them view death as an unacceptable sentence. Along this same line, the life without parole option allows jurors an intermediate step over the chasm between death and the possibility that the murderer could once again be released into their community some time down the road, a step which presumably could only benefit, rather than hinder, the plight of the murderer who would rather spend his life in prison than die.

Another reason, at the opposite end of the spectrum, could be retribution. The jury and judge could decide that for a particular defendant, spending the rest of his life imprisoned would be *more* of a punishment than a quick and painless death. *See, e.g., Smith v. State,* 686 N.E.2d 1264, 1272–74 (Ind.1997) (noting that some view life imprisonment as a "slow death" and "as equally severe" as a death sentence); *Vandiver v. State,* 480 N.E.2d 910, 911 (Ind.1985) (quoting appellant, who wanted to waive appeal of his death sentence, as stating, "Well, to me [being executed] would be less than getting a tooth pulled. It would be over with.")

Just as "the absence of legislative or court-imposed standards to govern the jury in weighing the significance of [the aggravating circumstances]" did not make Georgia's death penalty scheme unconstitutional, *Zant,* 462 U.S. at 880, 103 S.Ct. at 2744, the absence of standards to govern the jury in deciding whether death-eligible defendants should, instead, receive life imprisonment does not make Indiana's death penalty scheme unconstitutional.

Also, by giving the jury and sentencer the additional option of life without parole, the statute allows for the equally important considerations enunciated in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and its progeny, which call for individualized consideration of the circumstances of the defendant, his background, and his crime as part of the sentencing determination. *Spaziano,* 468 U.S. at 460, 104 S.Ct. at 3162; *Zant,* 462 U.S. at 879, 103 S.Ct. at 2743–44. For reasons as numerous as there are defendants found death-eligible through the statute's balancing process, life without the possibility of parole may or may not be an alternative sentence bestsuited for each. By leaving the judge and jury to decide for a particular defendant, after finding death *an* appropriate sentence, whether death is *the* appropriate sentence, the statute walks the tightrope between the "two quite incompatible sets of commands," *Collins v. Collins,* 510 U.S. 1141, 1141, 114 S.Ct. 1127, 1127, 127 L.Ed.2d 435 (1994) (denial of certiorari; Scalia, J., concurring), of *Furman* and *Lockett.*

---

**18.** This is actually a little more than the Eighth Amendment requires. As the Court re-emphasized in *Lowenfield v. Phelps,* 484 U.S. 231, 244, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988), the sentencing scheme upheld as consistent with the Eighth Amendment was one under which the aggravating circumstance played no role in guiding the sentencing body other than to make a defendant eligible for death.

## VIII. Jury Instructions on Child Molestation Aggravator

Stevens's death sentence is based in part upon the finding that Stevens killed Zachary Snider while committing the crime of child molesting, Ind.Code Ann. § 35–50–2–9(b)(1)(C) (West Supp.1997). Stevens claims that his due process rights were violated because the jury was not instructed on the presumption of innocence and the requirements of proof beyond a reasonable doubt as to each essential element of the crime of child molesting. Therefore, Stevens argues, the trial court erred when such instructions were not given during the sentencing phase of his trial.

Stevens did not make any objection to the instructions which were allegedly lacking, nor did he tender any of his own. "Such failures result in a waiver of the issue on appeal." *Snider v. State*, 274 Ind. 401, 403, 412 N.E.2d 230, 232 (1980); *see also* Ind. Crim.Rule 8(B). As with his prosecutorial misconduct claim, *see supra* part I, Stevens attempts to evade procedural default by claiming "fundamental error" in his Reply Brief.

■ An error is "fundamental" if it so prejudices the rights of a defendant as to make a fair trial impossible. *Tobias v. State*, 666 N.E.2d 68, 70 (Ind.1996). In *Bellmore v. State*, 602 N.E.2d 111 (Ind.1992), we concluded that the legislature's choice not to require penalty phase jury instructions stating either that the reasonable doubt burden of proof applies to each element of a (b)(1) aggravator, or that the defendant is presumed innocent as to such crimes, "does not run afoul of the Due Process Clause." *Id.* at 127.[19] Accordingly, the absence of such instructions does not make a fair trial impossible.[20] "Contrary to [Appellant's] assertion, we are not presented with a case of fundamental error." *Snider*, 412 N.E.2d at 232; *see supra* note 2.

## IX. (b)(11) Aggravator and Knowledge of Victim's Age

Stevens's death sentence was based, in part, on Zachary Snider being under the age of twelve when murdered. Ind.Code Ann. § 35–50–2–9(b)(11) (West Supp.1995).[21] Stevens argues that this aggravator must be understood to require the defendant's actual knowledge of the child's age when he committed the murder, and that insufficient evidence existed to show that on July 15, 1993, he knew Zachary was under twelve.

While acknowledging that this question has never been presented to this Court, Stevens argues that our holding in *Castor v. State*, 587 N.E.2d 1281 (Ind.1992), should control. In *Castor* the evidence at trial showed that the defendant might have believed the plain-clothed officers who surrounded him in unmarked cars to be mafia "hit men" when he opened fire and killed one of them. The trial court had instructed the jury according to our previous decision in *Moore v. State*, 479 N.E.2d 1264 (Ind.), *cert. denied*, 474 U.S. 1026, 106 S.Ct. 583, 88 L.Ed.2d 565 (1985), which stated that the

---

**19.** Stevens cites *State v. McCormick*, 272 Ind. 272, 397 N.E.2d 276 (1979), in support of his claims regarding the (b)(1)(C) aggravator. *McCormick* found the (b)(8) aggravator ("The defendant has committed another murder, at any time, regardless of whether the defendant has been convicted of that other murder") unconstitutional when applied to a murder for which the defendant had not been convicted and which was extrinsic to the murder for which the defendant was presently on trial. For the reasons mentioned in *Lowery v. State*, 640 N.E.2d 1031, 1044 (Ind.1994) (rejecting the *McCormick* reasoning as it pertained to the (b)(1)(B) aggravator (burglary)), we reject Stevens' argument on this point.

**20.** Stevens' case is also similar to *Bellmore* in that the court instructed the jury numerous times during the penalty phase of the State's burden to prove the existence of at least one aggravating circumstance beyond a reasonable doubt, (R. at 5456–57, 5459, 5461, 5466–67), and the jury indicated that it had found the existence of the (b)(1) aggravator beyond a reasonable doubt, (R. at 987).

**21.** At the time of Stevens' trial, the aggravator "The victim of the murder was less than twelve (12) years of age" was codified at Indiana Code § 35–50–2–9(b)(11). In 1996 General Assembly amended the death penalty statute by adding what is currently the (b)(11) aggravator and re-designating former subsections (b)(11) through (b)(14) as subsections (b)(12) through (b)(15), respectively. Act of Mar. 14, 1996, Pub.L. No. 228–1996, § 1, 1996 Ind. Acts 2735–36. The victim's age aggravator is now subsection (b)(12).

(b)(6) aggravator[22] applies if a defendant "knew or should have known" the victim was a law enforcement officer. *Castor,* 587 N.E.2d at 1289. Without specifically stating that it was overruling *Moore,* a bare majority of this Court determined that the aggravator required "actual knowledge" on the part of the defendant, rather the lesser "should have known" standard, and reversed and remanded for a new penalty phase trial and sentencing. *Id.* at 1290. The *Castor* majority said that the deterrence rationale underlying the aggravator justified the holding:

> "The policy at the base of the exercise of the police power here is to create a special deterrence to the direction of physical force against [those] upon whom the security of the community depends."
>
> . . . .
>
> We believe that the societal rationale for imposing death for one who kills a law enforcement official is promoted only if the defendant knew that the victim was a law enforcement official at the time of the killing.

*Id.* at 1289–90 (quoting *Moore,* 479 N.E.2d at 1283 (Debruler, J., dissenting)).

There was necessarily more than deterrence, however, supporting the *Castor* decision. The "knew or should have known" standard of *Moore* would deter *more* law enforcement officer murders because it would cause the hypothetical "rational murderer" to pause before killing someone who plausibly *might* be a law enforcement officer. The *Castor* "actual knowledge" standard, on the other hand, allows the "rational murderer" to err on the side of killing if he has any reason to question the status of his victim. Thus, rather than the articulated "deterrence" rationale, what appears to be the actual justification behind *Castor's* holding is the notion of *moral culpability.* This follows because the holding makes sense only if one views a defendant who knowingly murders a police officer or other public servant as more *deserving* of harsher punishment than one

who does not know his intended victim is a police officer. If such a mens rea makes the "cop-killer" more culpable, then logically the aggravator should not apply unless the defendant actually knew it was a police officer at whom he shot.

▬ When one sees the retributive reality behind *Castor's* "deterrence" language, the case before us is easily distinguished. Whereas a defendant may reduce his culpability by showing that he mistook a plain-clothed police officer victim for an average citizen, a defendant will never be able to reduce his culpability by claiming that he reasonably thought his eleven-year-old victim was actually twelve. The legislature has chosen an age-based bright line, rather than a more subjective standard such as "The victim was *a young child,*" presumably to avoid both the vagueness and litigatory problems the less specific language would create. Such a decision was not unreasonable, as twelve is a rational line of demarcation between pre-pubescence and adolescence. Because there is no moral culpability rationale for distinguishing between the murderer of an eleven-year-old child and the murderer of a twelve-year-old child, as there is between "law enforcement officer" and "civilian," the actual knowledge standard of *Castor* is unnecessary for cases involving the victim's age aggravator. Moreover, by applying the victim's age aggravator regardless of the defendant's awareness of his child-victim's age, such murders will be further deterred because their perpetrators will have to be absolutely certain that their victim is twelve or older, or suffer the consequences.

▬ Accordingly, we hold that when the (b)(11) aggravator is charged, all the State need show beyond a reasonable doubt is what the code states: that the victim "was less than twelve (12) years of age," Ind.Code Ann. § 35–50–2–9(b)(11) (West Supp.1995). Such a rule reflects the legislature's policies of both increased protection of young children and harsher punishment for those who prey

---

**22.** "The victim of the murder was a corrections employee, probation officer, parole officer, community corrections worker, home detention officer, fireman, judge, or law enforcement officer, and either: (A) the victim was acting in the course of duty; or (B) the murder was motivated by an act the victim performed while acting in the course of duty." Ind.Code Ann. § 35–50–2–9(b)(6) (West Supp.1994).

upon them. As we stated in *Barger v. State*, 587 N.E.2d 1304 (Ind.1992):

> [F]or most of this century, the legislature has enacted and reaffirmed a consistent public policy aimed at punishing offenders more harshly when the offenders commit crimes against younger children. Younger children are more in need of protection; they are less likely to be able to defend themselves and are more susceptible to adult suggestion and schemes.

*Id.* at 1307.

### X. Overlapping Aggravators

 Stevens claims that his right to a reliable and proportional sentencing determination was violated when the jury and court considered both the (b)(1)(C) (intentional killing while committing child molesting) and the (b)(11) (victim less than twelve years of age) aggravators as part of their sentencing determination. His argument arises from the fact that at the time of his sentencing hearing, the crime of child molesting was defined as performing or submitting to sexual intercourse or deviate sexual conduct with a child under twelve years of age.[23] Because the (b)(11) aggravator was necessarily proven once the (b)(1)(c) aggravator was proven, Stevens claims that this overlapping impermissibly skewed the balance between aggravators and mitigators against him and undermined the reliability of the sentencing determination.

Stevens cites several cases from other jurisdictions which allegedly support his position. The majority of these cases address death sentences predicated upon "murder for pecuniary gain" and "murder during the course of robbery" aggravating circumstances. *E.g.*, *Cook v. State*, 369 So.2d 1251, 1256 (Ala.1979); *Provence v. State*, 337 So.2d 783, 786 (Fla.1976); *Willie v. State*, 585 So.2d 660, 680–81 (Miss.1991). The rationale behind these cases is best summarized by *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, 293–297 (1984) (overlap of murder-to-avoid-apprehension aggravator with murder-while-in-the-course-of-aggravated-robbery aggravator, and the latter with murder-in-the-course-of-kidnapping aggravator), which found that overlapping aggravators unfairly increase the likelihood of a death sentence by inflating the weighing process in favor of the prosecution.[24]

Other jurisdictions have rejected this reasoning. In holding that the two aggravating factors should not be merged as one, the Supreme Court of North Carolina noted that the felony-murder aggravator and the pecuniary gain aggravators examine different aspects of the same crime, thus deserving separate consideration. *State v. Oliver*, 302 N.C. 28, 274 S.E.2d 183, 204 (1981). The Wyoming Supreme Court noted, furthermore, that the rule of merger enunciated by the other cases "is premised upon an assumption that the number of aggravating circumstances has some independent significance." *Engberg v. State*, 686 P.2d 541, 553 (Wyo. 1984). In Wyoming, "the analysis of the defendant's conduct is qualitative, and the jury is not permitted to base its determina-

---

**23.** Ind.Code Ann. § 35–42–4–3 (West 1986) (age amended to fourteen by Act of Mar. 18, 1994, Pub.L. No. 79–1994, § 12, 1994 Ind. Acts 1097); (*see also* R. at 5470–71 (instruction to jury)).

**24.** *See also Cook*, 369 So.2d at 1256 (dual application of robbery-murder and pecuniary gain aggravators "in effect condemn[s] [the defendant] twice for the same culpable act—stealing money"); *People v. Bigelow*, 37 Cal.3d 731, 209 Cal.Rptr. 328, 340, 691 P.2d 994, 1006 (1984) ("[W]e believe the court should construe special circumstance provisions to minimize those cases in which multiple circumstances will apply to the same conduct, thereby reducing the risk that multiple findings on special circumstances will prejudice the defendant"); *Provence*, 337 So.2d at 786 (robbery-murder and pecuniary gain aggravators "refer to the *same aspect* of the defen-

dant's crime," (emphasis in original), causing "one who commits a capital crime in the course of a robbery [to] always begin with two aggravating circumstances against him while those who commit such a crime in the course of any other enumerated felony will not be similarly disadvantaged"); *Willie*, 585 So.2d at 680–81 (improper to not merge felony-murder (robbery) and pecuniary gain aggravators because, "[w]hen life is at stake, a jury cannot be allowed the opportunity to doubly weigh the commission of the underlying felony and the motive behind underlying felony as separate aggravators"); *State v. Rust*, 197 Neb. 528, 250 N.W.2d 867, 874 (1977) ("We think it is not reasonable to construe the definitions [of aggravators] in such a manner as to make them overlap and make the same identical facts constitute two aggravating circumstances").

tion upon the quantitative weighing of aggravating circumstances." *Id.*

The analyses from North Carolina and Wyoming are persuasive. As in *Oliver*, the aggravating circumstances at issue here address different policies, even though the age of the victim is an overlapping factor in both. The felony-murder aggravator focuses on the defendant's character, finding highly culpable "the fact that the mind of the accused has in the same criminal episode formulated and held the intent to kill and the intent to commit one of the enumerated felonies." *Lowery v. State*, 640 N.E.2d 1031, 1044 (Ind. 1994). *See also Woods v. State*, 547 N.E.2d 772, 794 (Ind.1989) ("The substantially contemporaneous presence of the intent to kill and the intent to commit one of the serious enumerated felonies is the gravamen of [the (b)(1) ] aggravating circumstance...."). The age of the victim aggravator, by contrast, focuses on the status of the victim, arising from the need to give heightened protection to younger children and to punish more severely those who harm them. *Barger v. State*, 587 N.E.2d 1304, 1307 (Ind.1992). As in *Engberg*, our death penalty statute involves the *weighing*, rather than the *counting*, of aggravating factors. Although Stevens' jurors were not instructed as clearly on this point as were the jurors in *Engberg*,[25] they were told repeatedly that they could only recommend the death or life without parole if they found the mitigating circumstances, if any, "outweighed" (and not "outnumbered") by the aggravating circumstance(s) alleged. (R. at 5458–59, 5461, 5466–67.)

We find no reason to believe that the total aggravating weight given to Zachary's age by the jury would necessarily increase simply because it is mentioned in more than one factor. As the Wyoming Supreme Court

said, "The sentencing authorities' balancing of aggravating and mitigating circumstances which the Florida court previously had said is never a 'simple summing of aggravating circumstances,' ... was not disturbed by the separate articulations of what is a single aspect although having separately identifiable characteristics." *Engberg*, 686 P.2d at 553 (quoting *State v. Dixon*, 283 So.2d 1, 10 (Fla.1973), *cert. denied sub. nom., Hunter v. Florida*, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974)).

## XI. Evidence Supporting Probation Aggravator

■ Stevens claims the evidence was insufficient to support the finding that Stevens was on probation for a felony, Ind.Code Ann. § 35–50–2–9(b)(9) (West Supp.1997), when he murdered Zachary Snider. "In resolving this claim we apply the same standard applicable when determining the sufficiency of evidence to convict." *Fleenor v. State*, 622 N.E.2d 140, 151 (Ind.1993) (citation omitted).

> [T]his Court neither weighs the evidence nor judges the credibility of witnesses. Rather, we consider only that evidence most favorable to the State and all reasonable inferences to be drawn therefrom. If there is substantial evidence of probative value which would permit a reasonable trier of fact to find the existence of [the aggravator] beyond a reasonable doubt, then the [sentence] must be affirmed.

*Johnson v. State*, 490 N.E.2d 333, 334 (Ind. 1986).

There is little doubt that substantial evidence of probative value existed. Christine McAfee, who had been chief probation officer for the Putnam Circuit Court until August of 1993, testified that she met Stevens on July 15, 1993, for the purpose of accepting transfer of his probation from Marion County.

---

**25.** The trial court in *Engberg* instructed the jury:
In making this determination you must use your reasoned judgment. You must weigh the mitigating circumstances against the aggravating circumstances and in doing so consider the following:
1. No numerical weight is assigned to any of the mitigating or aggravating circumstances.
2. The enumeration of the aggravating and mitigating circumstances does not indicate the weight to be given to any such circumstance.

3. One aggravating circumstance may be of such a nature as to outweigh one or more mitigating circumstance.
4. One mitigating circumstance may be of such a nature as to outweigh one or more aggravating circumstance.
*Engberg*, 686 P.2d at 553 (internal quotations omitted).

The meeting was "an introductory appointment to introduce [her] as [Stevens'] new supervising probation officer." (R. at 4525.) She testified that on July 15, 1993, Stevens was on probation.

There was also substantial evidence that he was on probation for a felony. A court abstract entered as evidence showed that "Christopher M. Stevens" was convicted of class C child molesting, and sentenced by Special Judge Andrew Fogle on February 17, 1993, to four years imprisonment, with one year executed and three suspended and on probation. An Order of Probation bearing the same cause number as the court abstract, signed by Judge Fogle, and dated February 18, 1993, was also entered into evidence. Ann Dubin, a Marion County adult probation officer, testified that she met with Stevens, whom she identified in court, for at least forty-five minutes on February 3, 1993, for the purpose of preparing a presentence report. The report regarded Stevens' recent conviction for class C child molesting, for which he was to have a sentencing hearing on February 17, 1993.

From this information the jury and the court could easily conclude beyond a reasonable doubt that the probation of which McAfee spoke was that referred to in the court abstract and order of probation. Stevens' argument is without merit.

## XII. Evidence of Prior Uncharged Misconduct

Stevens claims that his right to a reliable and proportionate sentence was violated when the State elicited testimony from defense expert Dr. Lawrence B. Lennon on cross-examination concerning Stevens' previous sexual molestation of an Indianapolis ten-year-old, his sexual molestations of approximately twenty-five to thirty other children, his alleged shooting and killing of another boy "out west," (R. at 5330–32), and Dr. Lennon's opinion regarding Stevens' future dangerousness, (R. at 5355–56). Stevens did not object to this line of questioning.

Defense counsel may not have objected because it was so apparent that this testimony was relevant to countering the mitigating evidence which Stevens had up to that point placed before the jury. Stevens "opened the door" by eliciting testimony from various witnesses regarding his non-violent and law-abiding character.[26] The obvious relevance of this evidence was its tendency to indicate that Stevens was not normally a violent or dangerous person, as if the murder of Zachary Snider had been a one-time, freak occurrence. "The State may properly introduce rebuttal evidence tending to disprove mitigating circumstances shown by defendant's evidence." *Fleenor v. State*, 622 N.E.2d 140, 149 (Ind.1993). This issue is waived.

## XIII. Appropriateness of Sentence

Stevens makes numerous challenges to the appropriateness of his sentence. First, he challenges the aggravating circumstances with the same arguments addressed previously. *See supra* parts IX–XI. For the reasons mentioned there, we again reject these claims here.

Second, Stevens claims that the court failed to consider adequately the mitigating evidence he presented.[27] Stevens es-

26. *See, e.g.*, R. at 4711 (Testimony of Billie Byrns, Stevens's aunt: Q: "Did you ever see Chris act in a violent manner in any way?" A: "No."); R. at 4888 (Testimony of Mary Criss, Stevens' grandmother: Q: "Has Chris ever been violent with you?" A: "No way, no." Q: "Have you ever seen him be violent to anybody else?" A: "No, I have not." ... Q: "Okay. But Chris has never been violent with you?" A: "No, no way. Chris has been a loving grandson, as loving as could be toward me, do anything."); R. at 4977–78 (Testimony of Matthew Stevens, Stevens' brother: Q: "Was Chris pretty nice to you?" A: "Yes." Q: "Okay. Did he ever beat up on you or anything like that?" A: "Huh-uh." Q: "Do you recall how Chris got along with John and Mark and Michelle and Angela then?" A: "Well, with Mark and John, it was kind of off and on." Q: "What do you mean by that?" A: "Well, they'd get in a few fights once in a while." ... Q: "Okay. Now, when they would get in fights, do you remember who started them?" A: "Kind of both. It could go either way." Q: "Okay. And would Chris hit John or Mark?" A: "No.")

27. One sub-heading in this section of Stevens' brief states, "The Sentencing Judge Failed To Consider The Mitigating Circumstances Of Stevens [sic] Youth As Well As Other Undisputed Mitigating Circumstances." (Appellant's Br. at 121.) While Stevens makes numerous allegations under this sub-section, he fails to make any arguments regarding his age at the time he killed

sentially claims that because the court's sentencing statement summarizes the evidence of his bad childhood and psychological problems and does not present both as detailed or as starkly as he thinks they deserve, the sentencer obviously underrepresented the weight of this evidence in its weighing process. In finding "the defendant's troubled childhood ... to be [a] mitigating circumstance ... proven by a preponderance of the evidence," the court clearly considered Stevens' growing up "in an unstable and abusive environment," his being placed in foster care at his mother's request, his father's molestation of his step-sister, his mother's incarceration for drug dealing, and Doctor Lennon's psychological evaluation of him in coming to its finding (R. at 996–97.) While a failure to find *at all* the existence of mitigating circumstances clearly supported by the record "may imply that they were improperly overlooked," *Crawley v. State*, 677 N.E.2d 520, 523 (Ind. 1997), "the sentencing judge is not obligated to credit these factors in the same manner as would the defendant," *id.; see also Saylor v. State*, 686 N.E.2d 80, 85–86 (Ind.1997); *Hammons v. State*, 493 N.E.2d 1250, 1255 (Ind.1986). If a sentencing judge need not ascribe the same weight to the proffered mitigating evidence as the defendant, it stands to reason that the sentencer also need not discuss such evidence in his sentencing

statement in as great of detail as the defendant would prefer in order to prove he or she adequately considered it. We find no indication that the trial court improperly considered or improperly weighed the available mitigating evidence.[28]

■ Third, Stevens claims that the trial court improperly considered non-statutory aggravators as part of its sentencing determination in violation of *Bivins v. State*, 642 N.E.2d 928, 955–56 (Ind.1994), *cert. denied*, 516 U.S. 1077, 116 S.Ct. 783, 133 L.Ed.2d 734 (1996).

The sentencing statement begins by setting forth facts supporting the charged aggravators, finding each proven beyond a reasonable doubt. (R. at 993–96.) The statement then discusses the mitigating evidence and finds Stevens' troubled childhood and confession to be mitigating circumstances proven by a preponderance of the evidence. (R. at 996–97.) The statement then weighs the aggravating and mitigating circumstances and concludes not only that "the mitigating circumstances are far outweighed by the three aggravating circumstances," but that "the mitigating circumstances are outweighed by the [victim's age] alone." (R. at 997.) The statement then indicates the court's consideration of the jury's unanimous recommendation for death,

Zachary Snider, which was twenty, pertaining to mitigation. Assertions in headings, without supporting argument and citation in text, are not adequate to preserve a claim for our review. *Pinkston v. State*, 268 Ind. 627, 629–30, 377 N.E.2d 1355, 1356 (1978).

28. Indeed, the court's awareness of Stevens' mitigating evidence, while summarized in the sentencing statement, was clearly expressed in the court's jury instruction:

Evidence has been introduced tending to prove the following as mitigating factors: One, Christopher Stevens was 20 years of age at the time of this offense; two, Christopher Stevens was raised in a poor, dysfunctional, nonnurturing environment; three, Christopher was physically, verbally, and emotionally abused and neglected as a child; four, Christopher Stevens was sexually abused as a child and was not believed or protected from such abuse; five, Christopher Stevens has performed poorly in school; six, Christopher Stevens was moved frequently and, therefore, was kept from establishing meaningful relationships with friends and family as a child; seven, Christopher Ste-

vens has been diagnosed with severe depression and a passive dependent personality disorder; eight, Christopher Stevens as a child observed the sexual abuse of his step-sister; nine, Christopher Stevens was abandoned by his mother as a child; ten, Christopher Stevens has frequently considered and attempted suicide; eleven, Chris Stevens has abused alcohol and drugs as a child and as an adolescent; twelve, Christopher Stevens has confessed to the crime of murder of Zachary Snider; thirteen, Christopher Stevens has low average intelligence; fourteen, Christopher Stevens' [sic] mother was incarcerated for a period of his formative years; fifteen, Christopher Stevens' [sic] father was incarcerated for a period of his formative years; sixteen, Christopher Stevens was cooperative with and did not resist the arresting officers; seventeen, Christopher Stevens had inappropriate role models during his formative years; eighteen, Christopher Stevens suffers from low self-esteem, and this was created and reinforced by his family and peers. (R. at 5467–69.)

placing "significant weight upon the jury's recommendation." (*Id.*) The court then states,

> The Court having made a separate, independent assessment of the facts of this case, having balanced the aggravating circumstances and the mitigating circumstances, and having found that the mitigating circumstances are not outweighed by the aggravating circumstances, the Court now finds that the death penalty is the appropriate punishment for the defendant, Christopher M. Stevens, and for this crime.

(R. at 997–98.) Stevens specifically refers to the following, which concludes the court's sentencing statement:

> In addition to the evidence previously discussed, the Court finds this murder was calculated. It was motivated by self-preservation, coolly performed with deliberation, and coupled with the defendant's sexual gratification. The defendant placed the possibility of his arrest for child molesting above the life of a ten year old boy. He stated that if placed in this position he would kill in order to avoid returning to jail. That is exactly what he did. He clearly acted in a cold-blooded manner. After his first attempt to suffocate Zachary was unsuccessful, he acted intentionally and deliberately a second and third time before successfully obtaining his goal of permanently silencing the child. Imposition of the death penalty in this case is proportionate to the nature of the offense and appropriate for the defendant, Christopher M. Stevens, and the death penalty is therefore imposed upon Christopher M. Stevens.

(R. at 998.)

Even if the facts articulated in the judge's surplus statement indicate some influence on his decision, they appear mostly to be restatements of facts which would fall within the charged aggravating factors. Stevens himself states,

> Such terms as "calculated", "coolly performed with deliberation", and "cold-blood-

ed manner" are no more than synonyms for the culpability element of the (b)(1) aggravator, "intentionally". Ind.Code § 35–50–2–9(b)(1). Likewise, the reference to "sexual gratification" as a reason for sentencing Stevens to death duplicates the underlying felony he found in this aggravator, child molesting.

(Appellant's Br. at 127.)

The molestation and intentional murder of a ten-year-old child by one on probation, especially probation for a previous child molesting conviction, exemplifies a crime and criminal particularly worthy of the severest of penalties. While his confession and troubled childhood were mitigating circumstances properly found present, we agree with the trial court's determination that these weighed far less than the aggravating circumstances. *See Peterson v. State*, 674 N.E.2d 528, 543 (Ind.1996), *cert. pending*, (finding evidence of defendant's "difficult childhood" to be in the "low range" of mitigating evidence). After reviewing the sentencing process and facts supporting the trial court's decision, we determine that the death penalty is appropriate under the code and the constitutions and adequately reflects the nature of the offense and offender.

## XIV. Comparative Proportionality Review of Death Sentences

Stevens reads our cases as interpreting article one, section sixteen of Indiana's Constitution[29] to require comparative proportionality review of all death sentences. Based on this premise, Stevens argues that our proportionality review violates due process because our "procedure ... is difficult to determine at this point," thus failing to provide an appellant with "notice and a meaningful opportunity to present the arguments supporting the individuals [sic] position." (Appellant's Br. at 130.)

While we have performed such review in some of our decisions, *see, e.g., Saylor v. State*, 686 N.E.2d 80, 88–89 (Ind.1997); *Peterson*, 674 N.E.2d at 543; *Bivins v. State*, 642 N.E.2d 928, 959 (Ind.1994), *cert. denied*,

---

**29.** "Excessive bail shall not be required. Excessive fines shall not be imposed. Cruel and unusual punishments shall not be inflicted. All penalties shall be proportioned to the nature of the offense." Ind. Const. art. I, § 16.

516 U.S. 1077, 116 S.Ct. 783, 133 L.Ed.2d 734 (1996); *Johnson v. State,* 584 N.E.2d 1092, 1108 (Ind.1992); and have stated that appellate counsel should make comparative proportionality arguments when advocating for their clients, *Games v. State,* 535 N.E.2d 530, 538 (Ind.1989), we have not found such review constitutionally required.

Indeed, in *Baird v. State,* 604 N.E.2d 1170 (Ind.1992), we clearly stated that article one, section sixteen, "does not mandate comparative proportionality review, but review based upon the nature of the offense and offender." *Id.* at 1183. The "proportionality" mentioned in section sixteen addresses whether the sentence given a defendant is appropriate to the nature of the particular offense and offender, not whether the sentence is reasonable in light of all other cases imposing a similar sentence.

### Conclusion

The conviction and the penalty were imposed in accordance with the Indiana Code and applicable constitutional requirements.

We affirm the trial court.

DICKSON, SULLIVAN, SELBY and BOEHM, JJ., concur.